**UNITED STATES of America**

v.

**Thomas C. REED, Defendant.**

**No. 84 Cr. 610 (RJW).**

United States District Court,
S.D. New York.

Jan. 24, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the Government; Paul L. Shechtman, Asst. U.S. Atty., New York City, of counsel.

Stillman, Friedman & Shaw, P.C., New York City, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant; Edward M. Shaw, New York City, of counsel. Daniel E. Casagrande and Mary C. Kennedy, New York City, and Michael J. Plishner and John E. Morris, San Francisco, Cal., on the brief.

Securities and Exchange Commission, Washington, D.C., for amicus curiae; Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Rosalind C. Cohen, Asst. Gen. Counsel, Robert Mills, Sp. Counsel, Washington, D.C., Richard A. Levine, Atty., New York City, Paul Gonson, Sol., Washington, D.C., of counsel.

OPINION

ROBERT J. WARD, District Judge.

1. Section 10(b) of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 reads:

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

In a four count indictment (the "Indictment") filed on August 30, 1984, defendant Thomas C. Reed ("Reed") was charged by a grand jury in the Southern District of New York (the "Grand Jury") with criminal violations in connection with the purchase and sale of stock call options of Amax, Inc. ("Amax"), during the winter of 1981. Specifically, Reed is charged in Count One of the Indictment with securities fraud in violation of sections 10(b) and 32 of the Securities Exchange Act of 1934, (the "Exchange Act"), 15 U.S.C. §§ 78j, 78ff, and Rule 10b–5, 17 C.F.R. § 240.10b–5.[1] Based on the same allegations, Count Two charges that Reed's conduct constituted wire fraud in violation of 18 U.S.C. §§ 2, 1343.[2] In Count Three of the Indictment it is alleged that Reed lied in a deposition in which he

2. Section 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

As a result of a "typographical" error, the statutory reference in Count Two originally referred to 18 U.S.C. § 1341, proscribing mail fraud, instead of 18 U.S.C. § 1343, which relates to wire fraud. See United States v. Reed, No. 84–610, Transcript, Pre-trial Conference at 4 (S.D. N.Y. Oct. 2, 1984). ("Pre-trial Conference Transcript"). At a pre-trial conference with the Court on October 2, 1984, it was agreed by counsel for both sides that the Indictment be amended nunc pro tunc to reflect this and other corrections. Inasmuch as all the alterations to the Indictment were facial and without substantive affect on the issues and allegations presented by that document, it was determined to denominate the corrected indictment as 84 Cr. 610(RJW)*, and that there was no necessity to present the changes to the Grand Jury to issue a superseding indictment. For simplicity and convenience, the Court will refer to the charging documents in the instant action as the "Indictment." This reference shall be deemed to incorporate the changes agreed upon by the parties in open court. See Pre-trial Conference Transcript at 4–8. See also infra notes 6, 9.

testified in connection with a civil action for securities fraud brought by persons who sold Amax options at the time that, *inter alios*, Reed traded. Reed is thus charged in Count Three with perjury, in violation of 18 U.S.C. § 1623.[3] Count Four of the Indictment charges that Reed created and used fraudulent documentation to obstruct justice in the civil proceeding, in violation of 18 U.S.C. § 1503.[4] Reed now moves, pursuant to Rule 12(b), Fed.R.Crim.P., to dismiss the Indictment, on the grounds that Counts One and Two fail to allege criminal offenses, and that venue for Counts Three and Four does not properly lie in the Southern District of New York. For the reasons hereinafter stated, Reed's motion is granted in part and denied in part, and Counts Three and Four of the Indictment are dismissed.

## I. BACKGROUND

The Court assumes, as it must, the truth of the facts as alleged in the Indictment and may not consider defendant's contrary assertions of fact. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952); *United States v. Pacione*, 738 F.2d 567, 568 (2d Cir.1984); *United States v. Von Barta*, 635 F.2d 999, 1002 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

The gravamen of the Government's case against Reed, as charged in the Indictment, is the allegation that, from on or about January 26, 1981, up to and including March 18, 1981, Reed engaged in a fraudulent scheme designed to enrich himself, as well as his friends and associates, by trading in the securities of Amax while he was in possession of material, nonpublic, confidential information. Thereafter, it is alleged, Reed fraudulently and perjuriously attempted to disguise his transgressions. Specifically, it is asserted, that as part of this fraudulent scheme: (a) Reed obtained nonpublic, confidential information concerning the proposed merger of Amax into Standard Oil Company of California ("Socal") from his father, Gordon W. Reed; (b) Reed misappropriated this information and engaged in the purchase and sale of Amax stock call options without first disclosing the confidential information in his possession, in breach of a duty arising from a fiduciary and other relationship of trust and confidence owed by Reed directly to his father, to Amax and to the shareholders of Amax; and (c) Reed thereafter both gave perjurious testimony in a deposition and submitted fraudulent and misleading documentation during the course of discovery proceedings in connection with a civil action brought by options traders against Reed and others based on the sale of Amax call options during the period at issue herein.

### A. *Factual Allegations*

At all times relevant to the Indictment, Reed was the president of Quaker Hill Development Corporation ("QHDC") in San Rafael, California. QHDC is a land devel-

---

**3.** Section 1623(a) reads:

Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**4.** Section 1503 provides:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

opment company wholly owned by Reed and his family. Reed's father was at this time a member of the Board of Directors of Amax, and chairman of the Amax Petroleum Corporation, a wholly owned subsidiary of Amax. At all times relevant to this action, Amax was a publicly-held corporation engaged in the exploration for and the mining and refining of ores and minerals. Amax stock is traded on the New York Stock Exchange and other exchanges.

During this time, Socal was a publicly-held corporation engaged in world-wide, integrated petroleum operations. Since 1975, Socal has owned approximately twenty percent (20%) of Amax common stock. From in or about September 1980 up to and including March 4, 1981, Amax was engaged in nonpublic, confidential discussions concerning a proposed merger of Amax into Socal. Specifically, on January 26, 1981, the chairman of the Board of Directors of Amax met with the chairman of the Socal Board of Directors to discuss the possibility of a merger of Amax into Socal. These discussions were secret and confidential. Four days later, Reed purchased one hundred "March 45" Amax stock call options in the name of QHDC.[5] This purchase was made shortly after Reed had participated in a telephone conversation with his father. On the next business day, February 2, 1981, Reed purchased an additional four hundred "March 50" Amax call options in the name of QHDC. On the following day, Reed telephoned Ian K.

MacGregor, a member of the Amax Board of Directors in an attempt to obtain further information concerning the likelihood of a merger between Amax and Socal.

The merger discussions continued through February and into early March 1981. On February 25, 1981, the Socal Board of Directors approved in principle a merger proposal pursuant to which Socal offered to acquire all outstanding Amax common stock in exchange for cash and Socal securities worth approximately $78.50 per Amax share. This offer was communicated in confidence to the chairman of the Board of Directors of Amax for consideration by the Amax Board. Information concerning the Socal offer was then disseminated to the members of the Amax Board of Directors, including Gordon Reed. At that time Gordon Reed was vacationing on the Island of Barbados.

On March 2, 1981, and again on March 4, 1981, after Gordon Reed had received news of the Socal offer, Reed spoke by telephone with his father. During those conversations, Reed received nonpublic, confidential information relating to the Socal merger proposal. This information was provided to Reed in confidence and with the firm expectation that Reed would respect this confidence. The relationship between Reed and his father was particularly close; the two men frequently discussed business affairs in the expectation that Reed would keep his father's confidences.[6]

---

5. A contract for Amax "March 45" call options entitled the option holder to purchase, on or before March 20, 1981, one hundred shares of Amax Common stock at forty-five dollars ($45.00) per share. Similarly, a contract for Amax "March 50" call options entitled the option holder to purchase, on or before March 20, 1981, one hundred shares of Amax common stock at fifty dollars ($50.00) per share. Because Amax common stock was selling well below the forty-five and fifty dollar "strike prices" prior to the announcement of the Socal merger offer, Reed's options were "out-of-the-money" when he purchased them.

6. As it originally appeared, paragraph 4 of the Indictment alleged that Reed and his father "had a special relationship of trust and confidence and frequently discussed business affairs in the expectation that each would keep the

other's confidences." At the October 2, 1984 pre-trial conference, counsel for the Government explained that the parties had agreed that

what matters here is that Tom Reed would keep his father's confidences and that the other direction of that two way street, so to speak, is mere surplusage, so that what I would propose and what I think Mr. Shaw agrees to is [paragraph 4] would be corrected to say frequently discuss business affairs in the expectation that Thomas C. Reed would keep his father's confidences. I think that satisfies Mr. Shaw who just thinks the surplusage of the two way street is unnecessary and the government agrees with that, it has no objection.

Pre-trial Conference Transcript at 5–6. *See supra* note 2.

This time, however, Gordon Reed's expectations of confidence were to be disappointed. On March 4, 1981, at 9:42 a.m. (Eastern Standard Time), immediately after the completion of a telephone conversation with his father, Reed placed a series of phone calls to the brokerage firm, Dean Witter Reynolds, Inc., in San Rafael, California, in an attempt to purchase Amax securities while he was in possession of nonpublic, confidential information concerning the Socal merger proposal. Later that morning, after contacting his securities broker, Reed purchased five hundred "March 50" Amax call options on the American Stock Exchange in New York City, at a total cost of $3,346.76.

On the following day, at a special meeting, the Amax Board of Directors considered the Socal merger proposal and determined not to support that offer. This decision of the Amax Board and the details of the Socal merger proposal were publicly disclosed for the first time on that afternoon.

On March 4, 1981, prior to the special meeting of the Amax Board of Directors and to the public disclosure of the Socal merger proposal, Amax common stock was trading at approximately thirty-eight dollars ($38.00) per share. On that same day, a contract for Amax "March 45" call options was trading at twelve and one half cents ($0.125) per share, and a contract for Amax "March 50" call options was trading at six and one quarter cents ($0.0625) per

share. On March 6, 1981, the day following the public announcement of the Socal merger proposal, the price of Amax common stock increased from an opening price of thirty-eight dollars ($38.00) to fifty-seven ($57.00) per share. Similarly, the price of Amax "March 45" call options increased from twelve and one half cents ($0.125) to twelve dollars and twenty five cents ($12.25) per share, while the price of Amax "March 50" call options jumped from six and one quarter cents ($0.0625) to eight dollars and seventy-five cents ($8.75) per share.

On or about March 6, 1981, in an effort to capitalize on the salutary effect of the disclosures of the Socal proposal on the price of Amax securities, Reed sold the five-hundred "March 50" call options that he had purchased two days earlier. Reed's profit from this transaction amounted to approximately four hundred thirty-one thousand dollars ($431,000.00).[7]

Subsequently, on March 10, 1981, O'Connor & Associates, an options trading firm, commenced a civil class action against eighteen defendants, including Reed, in the United States District Court for the Southern District of New York, *O'Connor & Associates et al. v. Dean Witter Reynolds, Inc., et al.*, 81 Civ. 1354(MEL). (the "*O'Connor* litigation"). Plaintiffs in that action had sold Amax call options during the period from February 23, 1981 to March 5, 1981.[8] In connection with that action, Reed testified in a deposition in San

---

7. Reed also sold for a considerable profit the Amax call options that he had purchased on January 25 and February 2, 1981. The purchase and sale of these options, however, is not included in the allegations and charges advanced by the Indictment, and is not here contended to constitute securities fraud or any other criminal offense.

8. *See O'Connor & Associates v. Dean Witter Reynolds, Inc.*, No. 81–1354, slip op. (S.D.N.Y. Jan. 11, 1985); *Securities and Exchange Commission v. Reed*, 97 F.R.D. 746 (S.D.N.Y.1983); *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 559 F.Supp. 800 (S.D.N.Y.1983); *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179 (S.D.N.Y.1981).
On December 23, 1981, after an investigation of the transactions here at issue, the Securities and

Exchange Commission (the "SEC") instituted a civil enforcement action against Reed and Frank M. Woods, alleging that on March 4, 1981 Reed and Woods purchased Amax call options while in the possession of nonpublic, confidential information concerning, *inter alia*, the Socal merger proposal. Simultaneously with the filing of the complaint, Reed and Woods entered into a "Stipulation, Termination, Dismissal and Order" ("Order") pursuant to which they agreed, among other things, to disgorge their profits from the sale of the options and to place the funds in an escrow account, subject to the terms of an agreement ("Agreement") that was incorporated into the Order. Pursuant to this Order Reed placed $427,000.00 in escrow; Wood contributed $49,000.00. The Agreement provided that the funds would be used to satisfy any judgments in or settlement of the *O'Connor* liti-

Francisco, California, on April 21–22, 1982.[9] The transcript of that deposition was thereafter filed with the United States District Court for the Southern District of New York. During this deposition, Reed gave perjurious testimony concerning the circumstances surrounding his transactions involving Amax call options. In the course of discovery proceedings in the *O'Connor* litigation, Reed also presented and relied upon false and misleading documentation, *i.e.*, handwritten notes that he had created in order to disguise the fact that he had engaged in such transactions while in possession of nonpublic, confidential information.

### B. *Asserted Violations*

Based on these allegations, the Grand Jury charged Reed with four criminal stat-utory violations. Count One alleges that Reed's March 4, 1981 purchase of five hundred "March 50" Amax call options operated as a fraud in violation of section 10(b) of the Exchange Act, and Rule 10b–5 thereunder.[10] Count Two is premised on Reed's telephonic conversation with the Dean Witter Reynolds offices in San Rafael, California and New York City, and charges that Reed's use of the telephone in connection with the disputed Amax options transactions constituted wire fraud in violation of 18 U.S.C. § 1343.[11] *See* Letter of Assistant United States Attorney, Paul L. Shechtman, Esq. to Edward M. Shaw, Esq. at 3 (Sept. 27, 1984) (the "Shechtman Letter"), contained as Exhibit B to the Reed Memo.[12]

The latter two counts of the Indictment involve the post-trading aspects of the

gation, the only action then pending against Reed and Woods in connection with the Amax options transactions at issue in the instant case. The Agreement further provided that any funds remaining after the termination of the *O'Connor* litigation would be used to satisfy any other action that might be brought against Reed based on the Amax stock options transactions. *See SEC v. Reed, supra,* 97 F.R.D. at 747. According to Reed, the funds were deposited in the escrow account upon the understanding that if there were no recovery by civil litigants, the proceeds would devolve to a charity chosen by Reed and agreed to by the SEC and the district court. *See* Memorandum of Law and Appendix Submitted in Support of Thomas C. Reed's Motion to Dismiss the Indictment ("Reed Memo."), No. 84–610 at 16 (S.D.N.Y. Oct. 17, 1984).

9. As a result of another typographical error, the Indictment originally indicated that Reed's deposition occurred "[o]n or about April 21 and 22, 1981." Indictment at ¶ 13. That reference was amended at the October 2, 1984 pre-trial conference to substitute "1982" in place of "1981." *See* Pre-trial Conference Transcript at 4. *See also supra* notes 2, 6.

10. The statutory violation asserted in Count One is contained in paragraph 9 of the Indictment and reads as follows:

On or about March 4, 1981, in the Southern District of New York and elsewhere, THOMAS C. REED, the defendant, unlawfully, wilfully, and knowingly, by use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, to wit, the American Stock Exchange, New York, New York, did directly and indirectly (a) employ devices, schemes, and artifices to defraud and (b) engage in acts, practices, and courses of business which operated

as a fraud and deceit, directly and indirectly, upon Gordon W. Reed, Amax, and Amax shareholders in connection with the purchase of 500 Amax "March 50" call options.
(Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b–5).

11. Count Two provides in paragraph 10 of the Indictment:

The Grand Jury further charges:
10. On or about March 4, 1981, in the Southern District of New York and elsewhere, THOMAS C. REED, the defendant, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, as more fully described in paragraphs 1 through 8 in Count One of this Indictment, which are hereby incorporated by reference as if fully set forth herein, transmitted and caused to be transmitted in interstate commerce writings, signs, signals, and sounds, to wit, telephone calls from San Rafael, California, to New York, New York.
(Title 18, United States Code, Sections 1343 and 2).

12. That missive was sent by counsel for the Government to plaintiff's counsel pursuant to an agreement between counsel and directly addresses interrogatories contained in a previous letter of defense counsel to Assistant United States Attorney Shechtman dated September 18, 1984. The Shechtman Letter begins:

Dear Mr. Shaw:
By letters dated September 18, 21, and 25, 1984, you have requested further specification of the Government's legal theory, various fac-

Government's case, in particular, the discovery phase of the *O'Connor* litigation. Count Three asserts that Reed committed perjury during his deposition in the *O'Connor* litigation in violation of 18 U.S.C. § 1623.[13] The last count accuses Reed of obstruction of justice by his "creating and using false and misleading documentation, to wit, handwritten notes ... to disguise the fact that he had made such purchases while in possession of unlawfully obtained non-public confidential information," in violation of 18 U.S.C. § 1503.[14] Indictment at ¶ 15.

### C. The Instant Motion

On October 17, 1984, Reed filed the instant motion to dismiss the Indictment in its entirety. At the outset, Reed expressly denied that he received any nonpublic, confidential information concerning the Socal merger proposal from his father or any other source prior to his March 4, 1981 securities transactions. Moreover, he ar-

gues that Counts One and Two should be dismissed because they each fail to allege acts that constitute a criminal violation by Reed. Even if the remaining two counts sufficiently allege criminal offenses, Reed continues, those counts should also be dismissed because venue for prosecutions for the offenses alleged in those counts does not properly lie in this district.

With respect to Counts One and Two, Reed argues that under the instant circumstances and consistent with the express language of the Indictment, the sole theory upon which guilt can rest is that Reed misappropriated "inside" information from his father for the purpose of engaging in highly profitable securities transactions. Reed asserts, and the Government agrees, that he cannot properly be charged as a "tippee" who illegally traded on the basis of nonpublic confidential information received from a corporate insider.[15] Pursu-

---

tual particulars, and certain "exculpatory" material. This letter sets forth the Government's reply to those requests. The Government believes that the material herein provided, along with the Indictment and documentary discovery, affords Thomas Reed the disclosures necessary to inform him of the charges and to permit him to prepare his motions and defense.

Shechtman Letter at 1 (footnote omitted).

According to defense counsel, this rather novel pre-trial exchange of information was agreed upon in an effort to address the litigation concerns of both sides. On the one hand, this exchange affords the defense an opportunity prior to trial to attack the sufficiency of the allegations in the Indictment. On the other hand, counsels' arrangement reduces the litigation risks for the Government. In the words of defense counsel, the exchange minimizes "for the [G]overnment the chances of a situation in which the [I]ndictment might be dismissed on motions at the end of the [G]overnment's case for failure to allege any offense, resulting in double jeopardy and the foreclosure of any [G]overnment appeal." Reed Memo. at 51 n. *.

**13.** The statutory violation alleged in Count Three is contained in paragraph 13 of the Indictment and reads in part:

 On or about April 21 and April 22, 1982, in the Southern District of New York and elsewhere, THOMAS C. REED, the defendant, having taken an oath that he would testify truthfully in a proceeding ancillary to a Court of the United States, to wit, a deposition in the civil lawsuit *O'Connor et al. v. Dean Witter*

*Reynolds, Inc., et al.* ("*O'Connor*"), 81 Civ. 1354 (MEL), unlawfully, wilfully, and knowingly and contrary to his oath made false material declarations as hereinafter specified....

**14.** Count Four more fully provides in paragraph 15 of the Indictment as follows:

 The Grand Jury further charges:
 15. From on or around March 10, 1981, up to and including the filing of this Indictment, in the Southern District of New York and elsewhere, THOMAS C. REED, the defendant, knowingly, wilfully, and corruptly, endeavored to influence, obstruct, and impede the due administration of justice, specifically a civil lawsuit, *O'Connor, et al. v. Dean Witter, et al.*, 81 Civ. 1354 (MEL), which was commenced on March 10, 1981, and is still pending in the United States District Court for the Southern District of New York, by creating and using false and misleading documentation, to wit, handwritten notes purporting to establish a lawful basis for his purchases of Amax options and to disguise the fact that he had made such purchases while in possession of unlawfully obtained non-public confidential information.
 (Title 18, United States Code, Section 1503).

**15.** The legal theory upon which the Government has predicated Counts One and Two is set forth at page two of the Shechtman letter as follows:

 The Indictment alleges that Thomas Reed received from his father Gordon Reed, a Director of Amax, Inc. ("Amax"), material, non-

ant to the recent decision of the Supreme Court in *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the argument proceeds, an essential element of tippee liability under Rule 10b–5 is proof that the tipping insider disclosed the confidential information with the knowledge or expectation that the tippee would trade on the information, and, thus, with the intent to defraud the securities holders of the insider's company. However, the Indictment does not allege the existence of such a state of mind on the part of Gordon Reed, and the Government has formally acknowledged that it will not endeavor to establish that Reed's father was possessed of such fraudulent intent. *See* Shechtman Letter at 2.

Reed argues that, given this state of affairs, the survival of Counts One and Two rises and falls with an entirely different theory of liability. Specifically, the Indictment alleges that Reed stood in a fiduciary or other relationship of trust and confidence with his father, that in breach of their relationship, Reed misappropriated the information about the Social merger proposal that he had learned from his father, and that, as a result, Reed's trades on March 4, 1981 constituted securities and wire fraud. *See* Indictment at ¶ 7. In his motion papers, Reed asserts that this "misappropriation" theory must fail for two independent reasons. First, he urges, the Indictment lacks the factual allegations necessary to establish the existence of a fiduciary relationship between Reed and his father. The mere assertion in paragraph 4 of the Indictment that "Gordon W. Reed and Thomas C. Reed had a special relationship of trust and confidence and frequently discussed business affairs in the expectation that Thomas C. Reed would keep his father's confidences" is insufficient, Reed contends, to sustain the Government's allegation that Reed was the confidant of his father. A second deficiency in Counts One and Two, Reed maintains, is that those counts do not allege and would not support a claim that defendant's conduct resulted in some legally cognizable injury or potential injury to Gordon Reed.

Turning to the remaining counts of the Indictment, Reed denies that he had testified falsely under oath or that he submitted fraudulent and misleading documents during the course of discovery proceedings in the *O'Connor* litigation. However, Reed continues, even if the charges contained in Counts Three and Four are accurate, he may not be prosecuted in the Southern District of New York for the crimes alleged. According to Reed, there exists binding Second Circuit authority to the effect that the proper venue for prosecutions for perjury and obstruction of justice is not the district in which the underlying judicial proceeding (the "target proceeding") is pending. Instead, Reed maintains, precedent has established that venue for such prosecutions lies only in the district in which the alleged criminal acts took place. Since both the deposition testimony and submission of documents at issue in the instant case occurred beyond the confines

public information concerning a proposal by Standard Oil Company of California ("Socal") to merge Amax into Socal and that thereafter Thomas Reed purchased Amax options and profitted handsomely on the basis of and without first disclosing the non-public information in his possession. That information was provided to Thomas Reed by his father in confidence and with the firm expectation, arising out of their special relationship, that the confidence would be respected. Accordingly, the Indictment does not allege that Gordon Reed provided the information to Thomas Reed for the "improper purpose of exploiting the information for their personal gain," *Dirks v. SEC*, [463 U.S. 646] 103 S.Ct. 3255, 3263 [77 L.Ed.2d 911] (1983), or that Gordon Reed anticipated "a pecuniary gain or a repu-

tational benefit that [would] translate into future earnings." *Id.* [103 S.Ct.] at 3266. This is not to say, however, that Gordon Reed acted properly in disclosing the proposed merger to Thomas Reed. As an agent of Amax, Gordon Reed owed his corporation a fiduciary duty to preserve its assets and to maintain its secrets—a duty which he breached by disclosing the confidential information to his son without a valid business or public purpose. (Brackets in original).

The footnote to this paragraph advises that [t]he Indictment does not "depend ... upon [the] claim that Thomas Reed disclosed 'business affairs' to Gordon with an 'expectation' that Gordon would 'keep' Thomas' confidence." Letter September 18, 1984 ¶ 3(c). (Brackets in original).

of this district, Reed concludes, there is no basis for venue in the Southern District of New York for prosecution under Counts Three and Four.

### D. *The Government's Position*

■ In response to Reed's motion, the Government argues that the Indictment should not be dismissed and that Reed's motion should be denied because Counts One and Two properly allege acts constituting securities fraud and wire fraud and because venue properly lies in this district for a prosecution under Counts Three and Four. With respect to the first two counts of the Indictment, the Government, joined by the SEC,[16] asserts that Reed engaged in criminally fraudulent conduct by misappropriating nonpublic, confidential information from his father, in breach of the Reeds' relationship of trust and confidence. Such conduct, the Government charges, violates the federal securities and wire fraud statutes, and is not protected from prosecution by the Supreme Court's decision in *Dirks v. SEC, supra,* 103 S.Ct. 3225. "Of course, none of these charges have been established by evidence, but at this stage of the proceedings the indictment must be tested by its sufficiency to charge an offense." *United States v. Sampson,* 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–175, 9 L.Ed.2d 136 (1962). Moreover, it is fundamental that an indictment must set forth the elements of the offense sought to be charged, and that an indictment that does not state a crime cannot be sustained. *See e.g., Walker v. United States,* 342 F.2d 22, 26 (5th Cir.), *cert. denied,* 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97 (1965); *Johnson v. United States,* 206 F.2d 806, 808 (9th Cir.1953).

In connection with Count Three, the Government contends that under the express terms of the federal perjury statute venue may lie in the Southern District of New York inasmuch as Reed's alleged prevarications occurred during a proceeding "ancillary to" a civil action in this district. *See* 18 U.S.C. § 1623(a). Similarly, the Government insists, the crime of obstruction of justice, with which Reed is charged in Count Four, may be prosecuted in this district because the relevant case law, legislative history, and public policy considerations permit such prosecutions in the district in which the administration of justice was intended to be impeded.

### II. COUNTS ONE AND TWO

The instant case presents an issue of first impression, this Court's resolution of which the Government contends significantly may affect future litigation under the securities laws.[17] Against this background, and at the risk of belaboring what may by now have become doctrinally obvious, the Court embarks upon a brief review of the recent additions to the relevant legal landscape in order to more carefully set the juridical context of the instant case. With the guidance of such precedent, the Court turns to address the various contentions of the parties and to assess the legal sufficiency of the allegations and charges presented by the Indictment.

### A. *Recent Precedent—The Necessity for a Fiduciary or Confidential Relationship*

■ The parties correctly perceive that the sufficiency *vel non* of Counts One and

---

**16.** On November 14, 1984, the SEC filed a motion for leave to participate as *amicus curiae* as well as a Memorandum in Opposition to Defendant's Motion to Dismiss the Indictment (S.D.N.Y. Nov. 14, 1984) (the "SEC Memo."). The SEC Memo. addresses only Count One of the Indictment, and the SEC takes no position with respect to the issues raised by, and the legal sufficiency of, the remaining counts. *See* SEC Memo. at 2 n. 2. The Court hereby grants the SEC's motion, and has considered that agency's arguments in arriving at the instant disposition.

**17.** At oral argument, the Government expressed some concern regarding the impact of this Court's disposition of the instant motion on future securities fraud investigations and litigation—both civil and criminal. See *United States v. Reed,* No. 84–610 Transcript of Oral Argument ("Oral Argument Transcript") at 40–44, 52 (S.D.N.Y. Nov. 30, 1984). Although the Court is acutely mindful of its duty to decide only those issues raised in only those actions that are properly *sub judice,* the Court is nevertheless aware of the contribution that circumspection and considered deliberation might make to the present context and its impact on future events.

Two depends upon this Court's assessment of the legal consequences of the relationship between Reed and his father as alleged in the Indictment. Both sides acknowledge that, as the Supreme Court held in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the mere possession of nonpublic, confidential market information does not bring with it a corresponding duty to publicly disclose that information or to abstain from trading on the basis of such select knowledge.[18] *See id.* at 234, 100 S.Ct. at 1117. Rather, the duty to "disclose or abstain" arises only from a relationship of trust and confidence either between the parties to a market transaction or between the trading party and the source of that information.

The defendant in *Chiarella* was a "markup man" employed by a financial printer. On the basis of information contained in various announcements of corporate takeover bids that his employer was hired to print, the defendant was able to deduce the names of the target companies of several bids before the final printing and dissemination of the announcements. Without disclosing this knowledge, he purchased stock in the target companies and sold the shares immediately after the takeover attempts were disclosed publicly. For his efforts,

the defendant found himself with substantial—albeit short lived—trading gains, as well as a seventeen count conviction for violations of section 10(b) and Rule 10b–5. Neither was to survive—the defendant was forced to disgorge his profits to the sellers of the shares, and the Supreme Court reversed his conviction. The Court explained that when an allegation of fraud is based upon nondisclosure, there can be no conviction absent a duty on the part of the defendant to speak. "And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Id.* at 228, 100 S.Ct. at 1114 (quoting *Restatement (Second) of Torts* § 551(2)(a) (1976)) (brackets in original).

Applying these principles to the case confronting it, the *Chiarella* court held that the defendant had been under no duty to disclose the information concerning the takeover plans of the acquiring companies. He was not a corporate insider, and had received no confidential information from the target companies. Moreover, the Court explained, no such duty arose from the defendant's relationship with the sellers of the target companies' securities because

18. The obligation to "disclose or abstain" was most explicitly expressed in *Cady, Roberts & Co.*, 40 S.E.C. 907 (1961). In that case, the SEC held that a broker-dealer and his firm violated section 10(b) by selling securities on the basis of undisclosed information obtained from a director of the issuer corporation who was also a registered representative of the brokerage firm. The SEC held that a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him. The obligation to disclose or abstain was formulated thusly:

An affirmative duty to disclose material information has been traditionally imposed on corporate "insiders," particularly officers, directors, or controlling stockholders. We, and the courts have consistently held that insiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment. Failure to make disclosure in these circumstances constitutes a vio-

lation of the anti-fraud provisions. If, on the other hand, disclosure prior to effecting a purchase or sale would be improper or unrealistic under the circumstances, we believe the alternative is to forego the transaction. *Id.* at 911 (footnote omitted).

See also, *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 235 (2d Cir.1974); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In the SEC's analysis, this obligation rested on two principal elements: first, the existence of a relationship affording access to inside information intended to be available for corporate purposes only, and second, the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure. *See Cady, Roberts & Co., supra*, 40 S.E.C. at 912. The SEC explained that "[a] significant purpose of the Exchange Act was to eliminate the idea that the use of inside information for personal advantage was a normal emolument of corporate office." *Id.* at 912 n. 15.

the defendant had had no prior dealings with them, was not their agent or fiduciary, and was not a person in whom those sellers had placed their trust and confidence. The Court concluded:

> We cannot affirm petitioner's conviction without recognizing a general duty between all participants in market transactions to forgo actions based on material, nonpublic information. Formulation of such a broad duty, which departs radically from the established doctrine that duty arises from a specific relationship between two parties, see n. 9, *supra*, should not be undertaken absent some explicit evidence of congressional intent.
>
> ....
>
> .... Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak. We hold that a duty to disclose under § 10(b) does not arise from the mere

possession of nonpublic market information.

*Id.*, at 233–35, 100 S.Ct. at 1117–18.[19]

More recently, in *Dirks v. SEC, supra,* 103 S.Ct. 3255, the Supreme Court had further occasion to address and refine the source and scope of tippee liability under the section 10(b) and Rule 10b–5.[20] In *Dirks,* the Court again rejected the notion that a general duty attaches to anyone who knowingly receives nonpublic material information from an insider to disclose that information before trading. Instead, Justice Powell reaffirmed his holding for the Court in *Chiarella* that the mere possession of nonpublic, confidential information does not give rise to a duty to disclose or abstain; only a specific relationship of trust and confidence between the parties creates such a duty.[21] *See Dirks v. SEC, supra,* 103 S.Ct. at 3262 n. 15; *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 12 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104

**19.** In the final section of the Opinion of the Court, Justice Powell indicated that the Court need not decide whether the defendant's conviction could be supported on the alternative theory that the defendant breached a duty to the acquiring corporation when he acted upon information that he had obtained by virtue of his position as an employee of a printer hired by that corporation since that theory had not been submitted to the jury at the defendant's trial. The Court declined to speculate as to whether such a duty exists, whether it had been breached, and whether such a breach constitutes a violation of section 10(b).

**20.** In *Dirks,* the petitioner was an officer of a New York broker-dealer firm who specialized in providing investment analysis of insurance company securities to institutional investors. He had received information from a former officer of an insurance company that the insurance company's assets were vastly overstated as a result of fraudulent corporate practices and that various regulatory agencies had failed to act on similar charges made by company employees. The petitioner conducted an independent investigation which corroborated the fraud charges. Neither the petitioner nor his firm owned or traded any of the company's stock, but throughout his investigation the petitioner openly discussed the information he had obtained with a number of clients and investors, some of whom sold their holdings in the company. The SEC censured the petitioner, having concluded that he had aided and abetted violations of the anti-

fraud provisions of the federal securities laws by repeating the allegations of fraud to members of the investment community who thereafter sold their stock in the insurance company. On review, the court of appeals affirmed the SEC's action and entered judgment against the petitioner. Reviewing and expanding upon the insider trading and tipping rules established by case law, the Supreme Court held that the petitioner had no duty to abstain from the use of the inside information he had obtained and reversed the disposition below. The Court explained that the petitioner had no pre-existing fiduciary duty to the insurance company and its shareholders. Moreover, because they were motivated by a desire to expose fraud and not by the lure of personal gain, the insurance company's employees, although insiders, had not violated any duty to the company's shareholders by providing information to the petitioner. In the absence of a breach of duty to the shareholders by the insiders, the Court concluded, there could be no derivative breach by the petitioner.

**21.** In so concluding the Court expressly rejected the idea that the antifraud provisions of the federal securities laws require equal information among all market participants. As the Court explained, "[t]his [notion] conflicts with the principle set forth in *Chiarella* that only some persons, under some circumstances, will be barred from trading while in possession of material nonpublic information." *Dirks v. SEC, supra,* 103 S.Ct. at 3262 (footnote omitted.)

S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 799 (2d Cir.1980).

Because this requirement of a specific relationship between the shareholders and the individual trading on inside information has created analytical difficulties for the SEC and the courts in policing tippees who trade on inside information, the Court expressly delineated the circumstances under which a ban on tippee trading attaches. The Court acknowledged that there must be some limits on tippee trading, else insiders might escape the constraints of their fiduciary duty not to exploit corporate information for personal gain by passing nonpublic, confidential information on to outsiders for the same improper purpose. Consistent with the precept that a relationship of trust and confidence is at the fulcrum of liability under section 10(b), the Court concluded that the tippee's duty to disclose or abstain from trading is derivative of the insider's duty. Justice Powell explained:

> Thus, some tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*. And for Rule 10b–5 purposes, the insider's disclosure is improper only where it would violate his *Cady, Roberts* duty. Thus a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

*Id.* at 3264 (footnote omitted).

As a result of the secondary nature of tippee liability, a tippee may be under a duty to disclose or abstain only when the information on which he relied was tipped to him by an insider in breach of the insider's fiduciary duty. Whether a particular disclosure constitutes such a breach, the Court concluded, depends in large part on the purpose of the disclosure. In the words of Justice Powell:

> the test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider, there is no derivative breach....
>
> .... [T]o determine whether the disclosure itself "deceive[s], manipulate[s], or defraud[s]" shareholders, *Aaron v. SEC*, 446 U.S. 680, 686, 100 S.Ct. 1945, 1950, 64 L.Ed.2d 611 (1980), the initial inquiry is whether there has been a breach of duty by the insider. This requires courts to focus on objective criteria, *i.e.*, whether the insider receives a direct or indirect personal benefit from the disclosure, such as a *pecuniary gain or reputational benefit that will translate into future earnings.*

*Id.* at 3265–66 (footnote omitted) (brackets in original).[22]

In the instant case, the Indictment does not allege and the Government does not maintain that Gordon Reed disclosed any information concerning the Socal offer with an eye towards receiving a direct or indi-

---

**22.** Unlike corporate insiders, who have independent fiduciary duties to both the corporation and its shareholders, the typical tippee has no such relationships. In a footnote, the Court observed:

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but

rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. When such a person breaches his fiduciary relationship, he may be treated more properly as a tipper than a tippee. For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

*Dirks v. SEC, supra*, 103 S.Ct. at 3261 n. 14 (citations omitted). *See infra* note 25.

rect personal benefit from such disclosure. In particular, it is nowhere charged that Gordon Reed revealed to defendant nonpublic, confidential information concerning the Socal offer out of a desire for "pecuniary gain or a reputational benefit that will translate into future earnings." *Dirks v. SEC, supra,* 103 S.Ct. at 3266. On the contrary, the Government has continually depicted Gordon Reed as the victim of his son's connivance, having mistakenly relied on defendant's confidence and on the expectation that the son would not trade on the basis of the father's disclosures. *See, e.g.,* Oral Argument Transcript at 24. Thus, the Government had not charged and does not here contend that Gordon Reed breached his *Cady, Roberts* duty to Amax and its shareholders not to use inside information for personal advantage. *See Cady, Roberts & Co., supra,* 40 S.E.C. at 912 n. 15. In the absence of such a breach by the insider, defendant's father, the Government concedes that there can be no derivative "tippee" liability by Reed, and defendant is not so accused.[23]

### B. *The Misappropriation Theory*

■ From the perspective of public policy, the constellation of principles enunciated in *Chiarella* and *Dirks* present this Court with a troubling anomaly. As applied, those principles indicate that an individual who receives from a corporate insider nonpublic, confidential information that is likely to affect the value of a corporation's securities will be liable if the insider made the disclosure out of a desire for personal material gain but not if the insider acted with a more benign purpose.[24] This conclusion, however, hardly ends the present inquiry. After the Supreme Court's decisions in *Chiarella* and *Dirks,* it is no longer open for the Government to pursue Reed for fraudulent nondisclosure on a theory of tippee liability. However, those cases raise no obstacle to the theory of liability propounded in the Indictment. Specifically, the Indictment alleges that Reed misappropriated from his father nonpublic, confidential information concerning the Socal merger proposal. Relying on the holding in *United States v. Newman,* 664 F.2d 12 (2d Cir.1981), *cert. denied,* — U.S. —, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), and its reaffirmation in *SEC v. Materia,* 745 F.2d 197 (2d Cir.1984), the Government argues that Reed committed securities and wire fraud when he "misappropriate[d] nonpublic information in breach of a fiduciary duty and trade[d] on that information to his own advantage." *SEC v. Materia, supra,* at 203.

■ This theory of liability attempts to impose criminal culpability for improper

---

**23.** In fact, the Government has expressly acknowledged that the

> Indictment does not allege that Gordon Reed provided the information to Thomas Reed for the "improper purpose of exploiting the information for their personal gain," *Dirks v. SEC* [463 U.S. 646], 103 S.Ct. 3255, 3263 [77 L.Ed.2d 911] (1983), or that Gordon Reed anticipated "a pecuniary gain or a reputational benefit that [would] translate into future earnings." *Id.* [103 S.Ct.] at 3266.

Shechtman letter at 2. *See supra* note 15.

The Government's allegations and its depiction of Gordon Reed as but an unwitting victim of defendant's fraud contrast sharply with the suggestion of the Supreme Court that under certain circumstances "[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend." *Dirks v. SEC, supra,* 103 S.Ct. 3266. As the Court made clear in that case, a breach of fiduciary duty and accompanying tippee liability exists only when the objective facts support the inference that the disclosing insider was motivated by personal gain. Such an inference is justified, for example, when the insider is motivated by some expected *quid pro quo* from the recipient or by an intention to benefit the particular recipient. In such a case, "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Id.*

**24.** Similar inconsistencies have led one commentator to object:

> It is difficult to discern any policy justification for resting the determination as to whether a securities fraud has been committed on the source of the non-public information. Regardless of how the defendant received the information ..., public investors are equally in need of protection. Furthermore, there is nothing in the language of section 10(b) or rule 10b–5 that suggests such a distinction.

Poser, *Misuse of Confidential Information Concerning a Tender Offer as a Securities Fraud,* 49 Brooklyn L.Rev. 1265, 1270 (1983).

trading on "outsiders," *i.e.*, persons who lack a direct fiduciary relationship with a corporation or its shareholders. *See generally* Note, *Outsider Trading After Dirks v. SEC*, 18 Ga.L.Rev. 593 (1984); Langevoort, *Insider Trading and the Fiduciary Principle: A Post-Chiarella Restatement* (*"The Fiduciary Principle "*), 70 Cal.L.Rev. 1, 44–53 (1982). Under this theory it is not argued that defendant breached some obligation to disclose material nonpublic information to those with whom he trades, or to the public-at-large. Rather, the focus of analysis under this approach is on the source of the information. *See* Langevoort, *The Fiduciary Principle, supra*, 70 Cal.L. Rev. at 46. Stripped to its essentials, outsider trading liability is premised on the common law principle that when a fiduciary profits from confidential information that he had received because of his fiduciary status, he breaches a legal duty to the person or entity that entrusted him with the information. The misappropriation of secret information for personal aggrandizement in breach of such a relationship constitutes fraud. *See e.g., United States v. Newman, supra*, 664 F.2d at 18. The origins of this approach can be traced to the law of restitution. A person who receives confidential information from another and misappropriates it for personal benefit is deemed to hold the proceeds of the misappropriation in a constructive trust for the benefit of the entrusting party. The misappropriator thus becomes the *trustee ex maleficio*, or quasi-fiduciary, of the entrustor. *See* Langevoort, *The Fiduciary Principle, supra*, 70 Cal.L.Rev. at 30–31 & n. 121. In the context of the securities laws, it does not matter for purposes of assessing liability whether the recipient of the information is actually trading in the securities issued by the source of the information. Rather, the duty is breached by the misappropriation and resulting profit, and a constructive trust attaches.[25]

In *United States v. Newman, supra*, 664 F.2d 12, the Second Circuit decided in the affirmative the issue left open in *Chiarella* as to whether criminal liability for securities fraud can be premised upon the fiduciary duty owed to an acquiring corporation by virtue of one's position as an employee of a firm retained by that corporation. The defendant in *Newman* was a securities trader and manager of the over-the-counter trading department of a New York brokerage firm. He had obtained confidential information concerning proposed corporate mergers and acquisitions from the employees of certain investment banking firms. The employees had misappropriated this information, which had been entrusted to their employers by corporate clients, and surreptitiously conveyed it to Newman. Newman, in turn, passed the information along to two foreign confederates. The three conspirators then constructed and executed an elaborate scheme for purchasing the stock of companies that were merger and takeover targets of the subject investment banking firms. By making such purchases prior to the announcement of the various corporate acquisitions and the accompanying rise in the market price of the target company's securities, the conspirators were able subsequently to sell the stock at prices well higher than the prices they had paid for the same securities. As a result, Newman and his co-conspirators reaped substantial profits, which they shared with the employees of the invest-

---

**25.** The viability of the misappropriation theory of outsider liability was suggested in a limited sense in *Dirks v. SEC, supra*, 103 S.Ct. at 3261 n. 14. *See supra* n. 22. According to the *Dirks* court, certain outsiders, such as underwriters, accountants, and attorneys may assume fiduciary obligations when they obtain inside information while working for the corporation. However, this fiduciary status does not arise merely from the receipt of confidential information, but rather, "[f]or such a duty to be imposed ... the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty." *Dirks v. SEC, supra*, 103 S.Ct. at 3261 n. 14. As this quotation makes clear, an outsider may assume a direct fiduciary obligation to the corporation only if both parties would normally expect any information exchanged in the course of their relationship to remain confidential.

ment banking firms. All five men were indicted for securities and mail fraud. In upholding the legal sufficiency of this indictment, a divided panel of the Second Circuit held that the defendants' misappropriation of confidential information entrusted to the investment bankers constituted the requisite element of fraud under Rule 10b–5 as well as a breach of duty to both the investment banking firms and those firms' clients. The court explained that "[b]y sullying the reputations of the [investment banking firms] as safe repositories of client confidences, [Newman] and his cohorts defrauded those employers as surely as if they took their money." *Id.* at 17 (citations omitted). Moreover, the court continued, the defendants also wronged the clients of the investment banking firms, "whose takeover plans were keyed to target company stock prices fixed by market forces, not artificially inflated through purchases by purloiners of confidential information." *Id.*[26]

In *Materia*, the Second Circuit reaffirmed its holding in *Newman* "that one who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." *SEC v. Materia, supra,* at 203 (footnote omitted). The court rejected as contrary to its holding in *Newman* the defendant's argument that, inasmuch as he had no duty of disclosure to those with whom he had traded, he could not be held to have violated section 10(b) and Rule 10b–5. The court instructed that ancillary issues such as standing and whether the defendant had breached a duty to a particular plaintiff arise only in private civil actions for securities fraud. They are not germane in en-

**26.** The circuit opined:

> In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. Appellee would have had to be most ingenuous to believe that Congress intended to establish a less rigorous code of conduct under the Securities Acts.

*Id.* at 18 (citations omitted). *See infra* at 48. In *O'Connor & Assoc. v. Dean Witter Reynolds, Inc., supra,* 529 F.Supp. 1179, the district court applied the principles articulated in *Newman* to hold that, while the defendants owed no duty to those with whom they had traded, including plaintiffs, they may still be held to have violated the federal securities laws by insider and tippee trading on the basis of material nonpublic information. *Id.* at 1185. In *O'Connor*, a class action spawned by the securities transactions at issue in the instant case, an options trading firm sued—on behalf of itself and all others similarly situated—Amax and Socal, insiders of those corporations and the insiders' tippees. The plaintiffs alleged that unknown insiders at either Amax or Socal or both had tipped inside information concerning the Socal takeover bid to certain customers and registered representatives of Dean Witter Reynolds, Inc. ("DWRI") and A.G. Becker Inc. ("Becker"), and that the named customers and registered representatives had purchased Amax call options prior to March 6, 1981, with undisclosed knowledge of the proposed merger. In addition, the plaintiffs alleged that DWRI and Becker substantially assisted their customers with knowledge that or in reckless disregard of whether the customers were trading on the basis of material nonpublic information. The plaintiffs sought relief under sections 10(b) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78n(e), Rules 10b–5 and 14e–3 thereunder, 17 C.F.R. §§ 240.10b–5 and 240.14e–3, and under common law fraud principles.

Certain of the defendants moved to dismiss the complaint pursuant to Rule 12(b)(6), Fed.R. Civ.P., on the ground that the complaint failed to state a claim for securities fraud because it does not allege a fiduciary relationship between the defendants and the plaintiffs. The thrust of the movants' argument was that, because the plaintiffs traded in options rather than in actual shares of Amax, the insiders did not stand in a fiduciary relationship with the plaintiffs.

Applying *Newman* to the facts presented, the court concluded that

> the complaint sufficiently alleges fraudulent conduct in violation of the securities laws. The insiders of Socal and Amax owed a fiduciary duty to their respective corporations not to trade on the basis of inside information or to tip that information to others. They allegedly breached those duties when the insiders or their tippees purchased call options on Amax stock. Just as the insiders owed no fiduciary duty to the persons with whom they traded in *Newman*, the insiders here may have owed no fiduciary duty to the writers of call options. Nevertheless, under the *Newman* rationale, because their trading or tipping breached fiduciary duties owed to other parties, the alleged conduct constituted a fraudulent practice within the meaning of the securities laws.

*Id.* at 1185.

forcement actions brought by the SEC. Rather, as the court had previously held in *Newman*, section 10(b) and Rule 10b–5 do not require the perpetration of a fraud on a particular buyer or seller of securities. It is sufficient that the defendant's conduct "operat[ed] ... as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Rule 10b–5. *See also SEC v. Materia, supra,* 201–203; *United States v. Newman, supra,* 664 F.2d at 18–19.

The defendant in *Materia* was employed as a "copyholder" by a financial printer. Despite extensive efforts by the employer and its clients to keep confidential certain information concerning proposed tender offers,[27] the defendant was able to derive the identities and purchase the securities of several tender offer targets. Soon after the public announcement of the planned corporate acquisitions and the concomitant rise in the market price of the securities, the defendant sold his holdings at substantial gains. Shortly thereafter, the SEC filed an enforcement action, charging that the defendant had violated and was about to violate section 10(b) and 14(e) of the Exchange Act and Rule 10b–5 and 14e–3 thereunder. The complaint was premised upon the SEC's allegations that the defendant had traded in securities of the tender offer targets on the basis of material nonpublic information that he had misappropriated from his employer and its clients. Following a nonjury trial, the district court held that the defendant's conduct violated the antifraud provisions of the federal securities laws as charged. On appeal, the

defendant did not contest the district court's finding that he had misappropriated confidential information from his employer and traded on that information to his advantage. Instead he argued that such activity does not violate the securities laws, an argument that the court held directly controverted its holding in *Newman*. *See SEC v. Materia, supra,* at 201. The court explained:

> Materia "misappropriated—stole to put it bluntly—valuable nonpublic information entrusted to him in the utmost confidence." *United States v. Chiarella,* 445 U.S. 222, 245 [100 S.Ct. 1108, 1123, 63 L.Ed.2d 348] (1980) (Burger, C.J., dissenting). We hold that such activity falls squarely within the "fraud or deceit" language of the Rule. Legislative history to the Securities Exchange Act of 1934 makes clear that the antifraud provision was intended to be broad in scope, encompassing all "manipulative and deceptive practices which have been demonstrated to fulfill no useful function." S.Rep. No. 792, 73d Cong., 2d Sess., 6 (1934). This language negates the suggestion that the provision was aimed solely at the eradication of fraudulent trading by corporate insiders. Against this expansive construction of "fraud or deceit," Materia's theft of information was indeed as fraudulent as if he had converted corporate funds for his personal benefit.

*Id.* at 201–202.

The Court similarly rejected the defendant's argument that his employer had not been injured by the defendant's misappro-

---

**27.** It appears that the defendant's employer took more than the usual precautions to maintain the confidentiality of such information. The general industry practice was described by Judge Kaufman in *Materia:*

> Because even a hint of an upcoming tender offer may send the price of the target company's stock soaring, information regarding the identity of a target is extremely sensitive and zealously guarded. It is customary, therefore, for offerors (or their law firms, which ordinarily draft such documents) to omit information that might tend to identify a target company until the last possible moment. Code names are used, blanks are left to be filled in

on the eve of publication, and occasionally misinformation is even included in early drafts. In sum, a quick reading of preliminary versions of these sensitive papers would not reveal the information sought to be guarded.

*SEC v. Materia, supra,* at 199. In addition to these impediments to discovery, the printer in *Materia* had a policy expressly forbidding its employees from trading on information they discovered during the course of their employment. "Written statements of this prohibition were posted conspicuously in [the employer's] plant, and copies were distributed to all employees." *Id.* at 199 n. 1.

priation of client confidences. The court opined that

> [a]mong a financial printer's most valuable assets is its reputation as a safe repository for client secrets. By purloining and trading on confidences entrusted to Bowne, it cannot be gainsaid that Materia undermined his employer's integrity. *See Newman, supra,* at 17. Accordingly, we are driven to the conclusion that, by his misappropriation of material nonpublic information, Materia perpetrated a fraud upon Bowne.

*Id.* at 202 (footnote omitted).

In expanding upon the conception of outsider-misappropriation liability under the securities laws that was marginally addressed in *Chiarella* and *Dirks,* the Second Circuit in *Newman* and *Materia* established a binary principle of analysis. On the one hand, the cases reveal that those who misappropriate nonpublic, confidential information that they then use to engage in securities trades may be liable under section 10(b) and Rule 10b–5 even if they owed no duty of disclosure to the sellers of the securities involved.[28] On the other hand, however, the cases have conditioned such liability on the existence of, at least, a duty of fidelity and confidentiality to some person or persons, which duty is rooted in a fiduciary or other relationship of trust or confidence between the misappropriator and the person or entity to whom the duty is owed.[29]

### C. The "Confidential Relationship" Principle

 As the foregoing cases require, and the parties readily concede, the focus of this Court's inquiry must settle upon the question of whether Reed and his father enjoyed a relationship of trust and confidence. According to the Government, this relationship both inspired the alleged disclosure by Gordon Reed and governed the uses that defendant legally might have made of such information. Absent proof of the existence of such a relationship and corresponding duty, Reed may not be held criminally liable under the "misappropriation" theory advanced in the Indictment. Similarly, inasmuch as Reed's alleged violation of the wire fraud act also requires proof of a fraudulent breach of fiduciary duty, failure by the Government to establish the special relationship alleged will prove fatal to both Counts One and Two. *See, e.g., United States v. Weiss,* 752 F.2d 777, 783 (2d Cir.1985); *United States v. Siegel,* 717 F.2d 9 (2d Cir.1983) (mail fraud statute is violated when fiduciary fails to disclose material information that he is under a duty to disclose to another under circumstances in which the non-disclosure could or does result in harm to another); *United States v. Newman, supra,* 664 F.2d 12 (same requirement for both securities fraud and mail fraud liability); *United States v. Bronston,* 658 F.2d 920 (2d Cir. 1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982) (mail fraud);

**28.** As one judge of this Court has recently commented:

> By endorsing the alternative "misappropriation" theory of Rule 10b–5 liability, *Newman, supra,* 664 F.2d at 17, the Second Circuit gave legal effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair, and that distinctions premised on the source of the information undermine the prophylactic intent of the securities laws.

*Securities and Exchange Commission v. Musella,* 578 F.Supp. 425, 438 (S.D.N.Y.1984).

**29.** *See, e.g., Moss v. Morgan Stanley Inc., supra,* 719 F.2d at 16 (emphasis in original):

> While we agree that the general purpose of the securities laws is to protect investors, the creation of a new species of "fraud" under

section 10(b) would "depart[ ] radically from the established doctrine that duty arises from a specific relationship between two parties ... [and] should not be undertaken absent some explicit evidence of congressional intent." *Chiarella v. United States,* 445 U.S. at 233, 100 S.Ct. at 1117....

> In effect, plaintiff's "misappropriation" theory would grant him a windfall recovery simply to discourage tortious conduct by securities purchasers. Yet, the Supreme Court has made clear that section 10(b) and rule 10b–5 protect investors against *fraud;* they do not remedy every instance of undesirable conduct involving securities. *Id.* at 232, 100 S.Ct. at 1116; *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 474–77, 97 S.Ct. 1292, 1301–03, 51 L.Ed.2d 480 (1977).

*United States v. Von Barta, supra,* 635 F.2d 999 (mail and wire fraud).

The Court notes at the outset of this undertaking that the concept of "confidential relationship," born and reared in equity, is by nature flexible and defiant of precise definition:

> Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded, and have refused to set any bounds to the circumstances out of which a fiduciary relation may spring.

36A C.J.S. *Fiduciary* at 385 (1961) (footnote omitted). *See also* Bogert, *Confidential Relations and Unenforcible Express Trusts,* ("Confidential Relations") 13 Cornell L.Q. 237 (1928); 3 J.N. Pomeroy, *Equity Jurisprudence* § 956, at 792 (5th ed. 1941). There are, then, "no hard and fast rules for determining whether a confidential relationship exists. *Roberts v. Sears, Roebuck & Co.,* 573 F.2d 976, 983 (7th Cir.), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978). *See also* G.G. Bogert, *The Law of Trusts and Trustees* ("Bogert") § 482 (Rev. 2d ed. 1978).

### 1. General Principles

Despite the lack of universality and uniformity of practice among courts and commentators in their analysis of the scope and effect of the legal constructs, "fiduciary relationship" and "confidential relation-ship," [30] certain associations have emerged as inherently fiduciary in nature. *See, e.g.,* Coffee, *From Tort to Crime: Some Reflections on the Criminalization of Fiduciary Breaches and the Problematic Line Between Law and Ethics ("From Tort to Crime"),* 19 Am.Crim.L.Rev. 117, 150–51 (1981); Bogert *supra,* §§ 481–82; Bogert, *Confidential Relations, supra,* 13 Cornell L.Q. at 248.

Among these interently judicial relationships are those of: executors, administrators, guardians, trustees, attorneys, and senior corporate officials. *See* Coffee, *From Tort to Crime, supra,* 19 Am.Crim. L.Rev. at 150; Scott, *The Fiduciary Principle,* 37 Cal.L.Rev. 539, 541 (1949). "Still, this list is far from exhaustive, and the common law has in fact always defined the term with deliberate imprecision and perhaps suprising expansiveness." Coffee, *From Tort to Crime, supra,* 19 Am.Crim. L.Rev. at 150. There are many other circumstances in which there is at least a great intimacy, confidentiality, reliance and superiority of influence as those enumerated but in which the law has no special designation for the relationship between the parties. Such relationships commonly are called "confidential relationships," and have enjoyed the same protections that chancery has extended to inherently fiduciary relations. *See, e.g.,* Bogert, *supra,* § 482 at 281.[31]

In the instant case, the Government concedes that the relationship between Reed

---

**30.** In many decisions these concepts are used interchangeably. *See, e.g., Chiarella v. United States, supra,* 445 U.S. at 228, 100 S.Ct. at 1114 (requiring a "fiduciary or other relation of trust or confidence"); Bogert, *supra,* at § 482, p. 280 (and citations thereat); *Kochorimbus v. Maggos,* 323 Ill. 510, 154 N.E. 235, 238 (1926). *But see Roberts v. Parsons,* 195 Ky. 274, 278, 242 S.W. 594 (1922).

**31.** The following distinction between the two types of relationship has been suggested by one commentator:

> To the writer it has seemed desirable to use the terms "fiduciary" and "confidential" to distinguish two separate types of relationships. The former term might well be reserved for relations which have distinct names and compartments in the laws, as, for example, the trust, agency, guardianship, etc. While the latter might be applied to that large miscellaneous list of cases where actual trust and confidence of a high type creates a corresponding duty, but where no tag or label can be given to the relationship except the broad term confidential relationship. Thus used, the term "fiduciary" would lay emphasis on intimacy arising from the innate character of certain fixed institutions, while "confidential" would stress intimacy having its origin in the attitude of a party himself.

Bogert, *Confidential Relations, supra,* 13 Cornell L.Q. at 248. *See* Comment, *The Confidential Relationship Theory of Constructive Trusts: An Exception to the Statute of Frauds ("The Confidential Relationship Theory"),* 29 Fordham L.Rev. 561–63 (1961).

and father was not inherently fiduciary, but argues instead that such relationship posses sufficient characteristics of a confidential relationship to subject Reed's conduct to the strictures of the securities laws. The Government asserts that Reed was possessed of his father's absolute confidence and purported to act with his father's interest in mind. In the Government's view the intimacy of interaction between Reed and his father and their repeated disclosure of confidences involving the affairs of business and commerce rendered their relationship "instinct with obligation." Government's Memorandum In Opposition to Thomas C. Reed's Motion to Dismiss ("Government's Memo."), at 9. (S.D.N.Y. Nov. 13, 1984). In reliance on this aura of confidentiality, the Government asserts, Gordon Reed relaxed the vigilence that he would have otherwise have exercised and informed Reed of the Socal merger proposal, despite the precautions normally attendant in such situations. Accordingly, the argument continues, when Reed traded on the basis of the inside information he had allegedly learned from father, he abused the confidence that his father had reposed in him, and thereby breached a duty owed to his father, in violation of the securities and wire fraud statutes. *Id.* at 10.

In opposition and response, Reed argues that the Indictment is deficient in two independent respects. First, Reed contends the Indictment fails to allege facts essential to a finding that Reed and his father were bound by a special relationship of trust and confidence, the breach of which violated the federal securities and wire fraud statutes. Thus, according to Reed, even if defendant had received inside information from his father, an allegation Reed vehemently disputes, he was not legally precluded from trading on that information absent complete public disclosure. Second, Reed maintains, the Indictment fails to allege any legally cognizable injury or potential injury to Gordon Reed resulting from defendant's conduct.

In assessing the arguments of the respective parties at this phase of the litigation, it is not necessary, were it possible, for the Court precisely to identify those factors that define the concept "confidential relationship" and to determine whether such a relationship existed between defendant and his father. In the final analysis, the assessment of the existence or absence of such a relationship invariably requires a series of factual findings and generally rests with the finder of fact, *i.e.*, the jury, at trial. Judges, charged with making the determinations of law by which to structure and evaluate those findings, may undertake this assessment only in those cases in which it is possible and proper to conclude that, as a matter of law, such a relationship does or does not exist. The very nature of the subject matter, however, reveals that such occasions will be scarce, and the instant case proves no exception. On the basis of the record as it now stands, this Court is unwilling to hold that under no reasonable construction of the allegations contained in the Indictment could no jury rationally find that defendant and his father were bound by a confidential relationship.

Nevertheless, in order to structure more meaningfully the endeavor reserved for the jury, it is necessary for the Court to discuss the sets of standards or series of considerations by which courts typically determine whether a relationship is possessed of such intimacy as to constitute a confidential relation. In declaring a relationship to be technically "confidential," the courts have emphasized a variety of factual considerations. *See* Bogert, *supra*, § 482 (and citations thereat). Chief among these factors, has been the actual placing of trust and confidence in one party by the other, which reliance has been sustained for a prolonged period. In addition, in certain types of cases, the courts generally focus on the disparity of position between the parties, "and this disparity is treated as highly important or as absolutely essential." *Id.* § 482 at 289 (footnote omitted). The courts are particularly wary when confronted with the interactions of those related by blood or marriage in circumstances in

which the reposal of great trust and the relaxation of one's general vigilance ordinarily would be present. "However mere kinship does not of itself establish a confidential relation." *Id.* § 482, at 300–11 (footnote omitted). *See, e.g., Francois v. Francois,* 599 F.2d 1286, 1292 (3d Cir.1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980) (spouses); Comment, *The Confidential Relationship Theory, supra,* 29 Fordham L.Rev. at 564, 566.[32] Rather, the existence of a confidential relationship must be determined independently of a preexisting family relationship.

As it is most frequently generalized, the common law is said to find that the clearest manifestation of a confidential relationship occurs "when confidence is reposed on one side and there is resulting superiority and influence on the other." 36A C.J.S. *Fiduciary, supra,* at 384 (footnote omitted). *See, e.g., Francois v. Francois, supra,* 599 F.2d at 1292 (quoting *Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417, 421 (1976)). ("confidential relation ... 'arises when one party places confidence in the other with a resulting superiority and influence on the other side.' ").[33] A more exten-

---

**32.** *See also Almada v. Ruelas,* 96 Ariz. 155, 393 P.2d 254, 256–57 (1964) (mother-children); *McMurray v. Sivertsen,* 28 Cal.App.2d 541, 83 P.2d 48, 51 (Cal.Dist.Ct.App.1938) (mother-son); *Hieble v. Hieble,* 164 Conn. 56, 316 A.2d 777, 780 (1972) (mother-son); *Dyblie v. Dyblie,* 389 Ill. 326, 59 N.E.2d 657, 660–61 (1945) (brothers); *Hunter v. Hunter,* 152 Ind.App. 365, 283 N.E.2d 775, 780 (Ind.Ct.App.1972) (siblings); *Burns v. Nemo,* 252 Iowa 306, 105 N.W.2d 217, 220 (1960) (father-daughter); *Wilkinson v. Cummings,* 194 Kan. 609, 400 P.2d 729, 732 (1965) (father-son); *Ruebsamen v. Maddocks,* 340 A.2d 31, 34 (Me.1975) (husband-wife and father-in-law); *Owings v. Owings,* 233 Md. 357, 196 A.2d 908, 912 (1964) (mother-children); *Schleifstein v. Greenstein,* 9 Mass.App. 344, 401 N.E.2d 379, 383 (Mass.App.Ct.1980) (mother-daughter); *Mannausa v. Mannausa,* 370 Mich. 180, 121 N.W.2d 423, 425 (1963), *appeal after remand,* 374 Mich. 6, 130 N.W.2d 900 (1964) (mother-son); *Olmstead v. Olmstead,* 233 Miss. 621, 103 So.2d 399, 402 (1958) (mother-son); *Gibson v. Gibson,* 534 S.W.2d 100, 104 (Mo.Ct.App.1976) (parents-son); *Cornatzer v. Nicks,* 14 N.C.App. 152, 187 S.E.2d 385, 386 (N.C.Ct.App.1972) (mother-sons); *Zarnowski v. Fidula,* 376 Pa. 602, 103 A.2d 905, 907 (1954) (parents-children); *Jones v. Jones,* 194 Okla. 228, 148 P.2d 989, 992 (1944) (father-son); *Bradbury v. Rasmussen,* 16 Utah 2d 378, 401 P.2d 710, 713 (1965) (blood relatives); *McCutcheon v. Brownfield,* 2 Wash. App. 348, 467 P.2d 868, 874 (Wash.Ct.App.1970) (mother-daughter); *Dombrowski v. Tomasino,* 27 Wis.2d 378, 134 N.W.2d 420, 425 (1965) (father-daughter and son-in-law); *In re Nelson's Estate,* 72 Wyo. 444, 266 P.2d 238, 250 (1954) (aunt-nephew), 36A C.J.S. *Fiduciary, supra,* at 388.

**33.** *See also Roberts v. Sears, Roebuck & Co., supra,* 573 F.2d at 983 (7th Cir.1978) (To determine "whether a confidential relationship exists.... [t]he trier of fact must examine all of the circumstances surrounding the relationship between the parties and determine whether 'one

person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first.' ") *(quoting, Kester v. Crilly,* 405 Ill. 425, 91 N.E.2d 419, 423 (1950)); *Edwards v. Traveler's Ins. of Hartford, Connecticut,* 563 F.2d 105, 115 (6th Cir.1977) ("a confidential relationship is one in which 'confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party....' ") (quoting *Iacometti v. Frassinelli,* 494 S.W.2d 496, 499 (Tenn.App. Ct.), *cert. denied,* (1973) (applying Tennessee law)); *Clyde v. Hodge,* 460 F.2d 532, 535 (3d Cir.1972) ("The elements of the confidential relationship are thus: (1) a relationship of actual closeness; (2) a substantial disparity in the parties' positions; (3) actual reliance by the settlor on the person in the position of the trust"); *McMurray v. Sivertsen, supra,* 83 P.2d at 52 (party alleging confidential relationship must establish that one party relied on other with resulting domination and superiority by other party); *Cheese Shop Int'l. Inc. v. Steele,* 303 A.2d 689, 690 (Del.Ch.), *rev'd on other grounds,* 311 A.2d 870 (Del.Sup.1973); *Trustees of Jesse Parker Williams Hospital v. Nisbet,* 191 Ga. 821, 841, 14 S.E.2d 64, 76 (1941) (fiduciary status based on position of dominance and control); *Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin,* 74 Ill.App.3d 233, 30 Ill.Dec. 104, 392 N.E.2d 759, 763–64 (1979) ("A confidential or fiduciary relationship involves confidence and trust on one side and dominance and influence on the other.... A confidential relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of another") (citation omitted); *Dyblie v. Dyblie, supra,* 59 N.E.2d at 660–61 (confidential relationship "involves the idea of trust and confidence and may be found to exist in any legal relationship where special confidence is imposed on one side and domination and influence on the other"); *Hunter v. Hunter, supra,* 283 N.E.2d at 779 ("a confiden-

sive formulation incorporating this common law approach has been advanced by the courts of New York:

> A fiduciary relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another. The term is a very broad one. It is said that the relation exists, and that relief is granted in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. Out of such a relation, the law raises the rule that neither party may exert influence or pressure upon the other, take selfish advantage of his trust or deal with the subject-matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of that other, business shewdness and hard bargaining being totally prohibited as between persons standing in such a relation to each other. A fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other.

*Mobil Oil Corp. v. Rubenfeld,* 72 Misc.2d 392, 399–400, 339 N.Y.S.2d 623, 632 (Civ.Ct. Queens County 1972), *aff'd,* 77 Misc.2d 962, 357 N.Y.S.2d 589 (Sup.Ct.App. Term 1974), *rev'd on other grounds,* 48 A.D.2d 428, 370 N.Y.S.2d 943 (2d Dep't 1975), *aff'd,* 40 N.Y.2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976) (franchising oil company breached fiduciary duty to franchisee by seeking to coerce franchisee to illegally fix prices and buy accessories from franchisor). *See also, Quintel Corp. N.V. v. Citibank, N.A.,* 567 F.Supp. 1357, 1363 (S.D.N.Y. 1983) (citing *Mobil Oil*); *Penato v. George,* 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976), *appeal dismissed,* 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977) (same).

Recently, in reliance on the generalized expression of the common law and its formulation in *Mobil Oil,* the Second Circuit adopted a two-pronged analysis to assist in determining whether a confidential relationship exists in a given situation. *See United States v. Margiotta,* 688 F.2d 108, 122 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891–92, 77 L.Ed.2d 282 (1983). In *Margiotta,* a county political party leader who did not hold public office was indicted on one count of mail fraud and five counts of extortion for activities in connection with the distribution of insurance commissions or municipal properties to the defendant's political allies. The theory of liability, upheld by the Second Cir-

tial relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other.... [and] the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge"); *Burns v. Nemo, supra,* 105 N.W.2d at 220 (same); *Ruebsamen v. Maddocks, supra,* 340 A.2d at 35 ("The salient elements of a confidential relation are the actual placing of trust and confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation"); *In re Jenning's Estate,* 335 Mich. 241, 55 N.W.2d 812, 813 (1952) ("a fiduciary relationship exists only when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another"); *Gibson v. Gibson, supra,* 534 S.W.2d at 104 ("a confidential relationship is synonymous with a fiduciary relationship, and extends to instances in which a special

confidence is reposed on one side and there is resulting *domination* and *influence* on the other") (emphasis in original); *Zarnowski v. Fidula, supra,* 103 A.2d at 907 ("It is only where parties do not deal on equal terms and one side exercises an over-mastering influence on the other that the law will designate the association to be that of a confidential relationship"); *In re Nelson's Estate, supra,* 266 P.2d at 250 (confidential relationship requires confidence). *Accord, Shapiro v. Rubens,* 166 F.2d 659, 666 (7th Cir.1948); *Almada v. Ruelas, supra,* 393 P.2d at 256–57; *Wilkinson v. Cummings, supra,* 400 P.2d at 733; *Owings v. Owings, supra,* 196 A.2d at 912; *Schleifstein v. Greenstein, supra,* 401 N.E.2d at 383; *Olmstead v. Olmstead, supra,* 103 So.2d at 402–03; *Cornatzer v. Nicks, supra,* 187 S.E.2d at 386; *Jones v. Jones, supra,* 148 P.2d at 992; *McCutcheon v. Brownfield, supra,* 467 P.2d at 874; *Dombrowski v. Tomasino, supra,* 134 N.W.2d at 425.

cuit was that the defendant's insurance "kickback" scheme fraudulently violated a fiduciary duty owed by the defendant to the citizens of the county. Since the defendant held no official public office and stood in no other inherently fiduciary position with respect to the county citizenry, it became necessary for the court of appeals to articulate the standards for determining whether a particular relationship should be accorded fiduciary statutes.[34] In attempting to define the elements of a fiduciary or confidential relationship, an endeavor the court termed "a most difficult enterprise," the court concluded:

> Although there is no precise litmus paper test, two time-tested measures of fiduciary status are helpful: (1) a reliance test, under which one may be a fiduciary when others rely upon him because of a special relationship in the government, and (2) a de facto control test, under which a person who in fact makes governmental decisions may be held to be a governmental fiduciary.

*Id.* at 122.[35]

Applying these guidelines, the court held that Margiotta's prosecution under the mail fraud statute was permissible despite the fact that he held no official public office. The circuit court observed that he "had a stranglehold on the respective governments of Nassau County and the Town of Hempstead," and that "he dominated governmental affairs [in those municipalities] as the de facto public leader." *Id.* In the Second Circuit's view Margiotta's conduct was reflective of the two measures of paradigmatic fiduciary relations, "the concepts of reliance, and de facto control and dominance, which are at the heart of the fiduciary relationship." *Id.* at 125.

### 2. *The Litigants' Contentions*

Seizing upon the *Margiotta* guidelines and the generalized formulation of the common law, Reed argues that the *sine qua non* of a confidential relationship is the reposal of trust and reliance by one party to the relationship resulting in the superiority and controlling influence of the other. Reed concludes that inasmuch as the Indictment does not allege such a state of events, he may not be held to have breached a confidential relationship with his father when Reed engaged in the disputed call options transactions. Conspicuous and controlling by their absence, Reed argues, are any allegations in the Indictment that Gordon Reed relied upon defendant and that defendant thereby dominated and controlled his father's affairs. Specifically, Reed maintains, it is not alleged that Gordon Reed depended upon defendant for the operation of his personal or business affairs or that Gordon Reed was accustomed to relying upon the guidance or judgment of defendant. Similarly lacking in the Indictment are any allegations that Reed occupied a plainly superior position to that of his father such that the parties did not deal on equal terms. There is also no assertion that Gordon Reed was physically or mentally incapacitated or that he is possessed of substantially inferior business knowledge and skill than is defendant.[36]

---

**34.** As framed by the court, *Margiotta* raised "the novel issue whether an individual who occupies no official public office but nonetheless participates substantially in the operation of government owes a fiduciary duty to the general citizenry not to deprive it of certain intangible political rights that may lay the basis for a mail fraud prosecution." *Id.* at 121.

**35.** Notwithstanding the court's use of these guidelines, the *Margiotta* court expressly indicated that it was not announcing a general "litmus paper test" for determining whether a confidential relationship exists in a given case. *See United States v. Margiotta, supra,* 688 F.2d at 122. Moreover, the analysis in *Margiotta* was directed at the precise parameters of the facts involved in that case. The Court, therefore, does not read *Margiotta* or any other decision of the Second Circuit as establishing a controlling definition of the confidential relationship concept to be applied in a variety of contexts, and particularly in the instant case.

**36.** It appears that Gordon Reed, who currently is eighty-four years old, has recently suffered a series of serious physical health problems and is in deteriorating physical condition. See Pre-trial Conference Transcript at 20–33. Nevertheless, the Indictment does not allege and the Court is aware of no other assertions that at the time of defendant's alleged offenses, Gordon Reed was physically ill or in any sense incapacitated or in poor health.

Notwithstanding the absence of such allegations, the Government maintains that the Indictment sufficiently alleges facts from which the existence of a confidential relationship between Reed and his father may be inferred. In the Government's view, Gordon Reed's asserted confidence and trust in defendant as well as Gordon Reed's reliance on the alleged series of prior disclosures of and discussions with defendant created an alliance of intimacy and correlative obligations between father and son. To maintain the Indictment, the Government argues, it is not necessary to establish or even allege that Reed dominated or controlled the person or affairs of his father. Rather, the argument continues, the Government need show only that defendant was invested with a duty of fidelity and confidence by virtue of his relationship with his father. By trading on the basis of the alleged disclosures of Gordon Reed, the government concludes, defendant breached the intimacy of his relationship with his father and therefore committed securities and wire fraud.

In support of this argument, the Government relies primarily upon the discussion of the elements of confidential relationships contained in 4 G.E. Palmer, *The Law of Restitution* ("Palmer") §§ 19.2–19.4 (1978). Palmer theorizes that the confidential relationship conception will differ in its essentials with the circumstances it defines. Palmer distinguishes between cases in which gifts are obtained through fraud and undue influence and cases in which property, usually land, is conveyed to a grantee who promises to hold the property in trust for the grantor or some third person. In both situations courts regularly grant equitable relief if they find that the grantor and grantee enjoyed a confidential relationship. However, Palmer contends, only in the undue influence cases do the courts require some form of dominance or superiority of position as a prerequisite for finding a breach of a confidential relationship. In the cases in which property is conveyed to a grantee who orally promises to hold the property in trust for the grantor or a third person, Palmer asserts, courts

generally do not—and should not—inquire as to whether the grantee was in a position to dominate the grantor. As Palmer more fully explained:

In most cases in which the court presumed undue influence because of a confidential relationship, the donor was elderly and in poor health, physically or mentally or both, and the donee was in a position to take advantage of the donor's weaknesses. Courts commonly stress the fact that the donor had no independent advice, suggesting that the relationship was such that the donor might not have made the gift had he been advised by a disinterested third party. In contrast, in cases in which a constructive trust is impressed on a grantee of land who agreed orally to hold in trust for another, and the basis of relief is breach of a confidential relationship, the grantor seldom had any of the weaknesses just described, nor did it appear that the grantee dominated him; the grantor simply *trusted* the grantee and believed that the relationship was such that the trust was not misplaced.

The reason for this difference in the meanings given to confidential relationship is disclosed when attention is paid to the reasons for treating the transferee as a constructive trustee. In the gift situation, the issue is whether the donee *obtained* the gift by a wrongful act, *i.e.*, undue influence. The confidential relationship with which courts are concerned is one which bears on whether there was such influence. In the oral trust situation, this is not a necessary part of the case for constructive trust relief. So far as appears, the grantee usually was guilty of no wrong in accepting title to hold in trust for the grantor or a third person. His wrong occurs after the transfer and consists of his breach of the confidence reposed in him. Unjust enrichment in the first case consists of acquiring property by the equitable wrong called undue influence, in the second of retaining property by a separate

equitable wrong consisting of breach of a confidential relationship.

*Id.* § 19.2, at 103–105 (emphasis in original) (footnotes omitted).

Consistent with this analysis, Palmer argues, if one party to a bargain transaction seeks to set aside a contract or a transfer of property on the ground that it was wrongfully acquired, courts will focus on those factors that may suggest overreaching, and in particular, whether the recipient of the benefit occupied the dominant position in the relationship. In contrast, Palmer asserts:

> when information such as a trade secret is disclosed in confidence, and the defendant uses the information in breach of confidence, restitution of benefits thereby obtained does not depend on any inequality of position between the parties when the secret was disclosed since relief

is not based on wrongful acquisition. Instead, the enrichment is deemed unjust because it is the product of a breach of confidence in using the secret information.

*Id.,* § 19.2 at 106 (footnote omitted). *See also, id.* at § 2.8(b). Palmer maintains that although the courts have not assigned a uniform definition to the confidential relationship construct in the oral trust context, in a significant number of decisions the courts have been willing to find such a relationship despite the existence of "nothing more than a close family relationship between the parties." *Id.* § 19.2 at 101. In sum, Palmer concludes, "[t]aking the cases as a whole, there is a strong inclination to find a confidential relationship from the fact of a close family connection." *Id.* § 19.3, at 113.[37]

**37.** It is unclear from the context whether Professor Palmer refers merely to the biological and ancestral affinity generally inherent in consanguineous relationships, or more specifically to the closeness-in-fact manifest in relationships of mutual confidence and affection between certain family members. While the argument with respect to the latter type of relationship bears some intuitive appeal, the Court notes—and Palmer should be read to concede—that neither proposition is entirely supported by the weight of the case law. *See id.* § 19.3(a), (b), (and citations thereat). In fact, the overwhelming majority of cases cited by Professor Palmer appear to require more than mere familial ties for a finding of a confidential relationship. *See Cole v. Adkins,* 358 So.2d 447, 449–50 (Ala.1978) (mother and son enjoyed confidential relationship because they were very close, and son assumed the major portion of the financial burden of taking care of mother during the last years of her life); *King v. Uhlmann,* 103 Ariz. 136, 437 P.2d 928, 937 (1968) (confidential relationship found because trusting party due to his perilous financial position had disclosed all his financial interests to other parties, completely relied on them, and was clearly in inferior bargaining position); *Davidson v. Sanders,* 235 Ark. 161, 357 S.W.2d 510, 517 (1962) (court finds confidential relationship between blood relatives on the basis of relationship of trust and confidence on one side and dependency on the other); *Allen v. Meyers,* 5 Cal.2d 311, 54 P.2d 450–51 (1936) (confidential relationship found because husband was active advisor of wife and by means of such advice placed himself in a position to perpetrate fraud on wife) (quoting *Taylor v. Bunnell,* 77 Cal.App. 525, 247 P. 240, 243 (Cal.Civ.App.1926)); *Quezada v. Hart,* 67 Cal.App.3d 754, 136 Cal.Rptr. 815, 818 (1977) (mother entrusted to son money and powers of negotiation in business affairs); *Weeks v. Esch,* 39 Colo.App. 428, 568 P.2d 494, 495 (1977) (daughter assisted aged and infirm mother in personal and financial affairs and enjoyed very close relationship with mother); *Kam Oi Lee v. Fong Wong,* 57 Hawaii 137, 552 P.2d 635, 638 (1976) (Kinship not sufficient to establish confidential relationship, "[h]owever, when parties are closely related, the imposition of great trust and the letting down of all guards is natural, and the relationship, coupled with evidence as to intrusting, the status of the parties as to health, age, education and dominance, may lead a court to find that a confidential relationship existed"); *Kester v. Crilly, supra,* 91 N.E.2d at 423–24 (factors to be considered in assessing existence of confidential relationship are: degree of kinship, disparity in age, health, mental condition, education and business experience of the parties, and the extent to which the allegedly servient party entrusts the handling of his business affairs to the other party and reposes faith and confidence in him); *Staab v. Staab,* 158 Kan. 69, 145 P.2d 447, 448 (1944) (confidential relationship found because grantor was uneducated, had placed the utmost confidence in his sons, and followed their advice in all matters of business); *Huffine v. Lincoln,* 52 Mont. 585, 160 P. 820, 821 (1916) (husband and wife enjoyed confidential relationship because wife was fatally ill and husband exerted influence over her business affairs); *Kent v. Klein,* 352 Mich. 652, 91 N.W.2d 11, 13 (1958) (family ties not sufficient to find confidential relationship, courts look also at degree of trust, confidence, dependence and inferiority of position of the parties);

Relying on Palmer's analysis, the Government argues that the allegations in the Indictment present a sufficient basis upon which to find that Reed abused the confidential relationship that he enjoyed with his father, and thereby violated the federal securities and wire fraud statutes. By analogy to cases involving the unautho-rized disclosure of trade secrets, *see*, *infra* at 37, the Government urges that even if this Court is unwilling to find that a confidential relationship existed solely because of the kinship of the Reeds, such a relationship can be premised on the duty of confidentiality that accompanied Gordon Reed's disclosure of the Socal merger proposal to

*Fleury v. Chrisman*, 200 Neb. 584, 264 N.W.2d 839, 843 (1978) (confidential relationship between brother and sister founded on fact that brother acted as compensated agent for sister and controlled and implemented her legal and financial affairs); *Clooney v. Clooney*, 118 N.H. 754, 394 A.2d 313, 316 (1978) (confidential relationship between close family relatives generally marked by disparity in position); *Pleakas v. Juris*, 107 N.H. 393, 224 A.2d 74, 75, 77 (1966) (confidential relationship found because trusting party completely relied on other party for counsel and advice, was under great strain, was old, and did not understand English); *Harrington v. Harrington*, 252 Or. 39, 448 P.2d 364, 365-66 (1968) (court finds constructive trust because grantee was physically and mentally ill and for a time had been committed to a mental hospital); *Silver v. Silver*, 421 Pa. 533, 219 A.2d 659, 662 (1966) (mere fact of mother-son relationship without more will not support a finding of a confidential relationship, court should also look to grantor's state of mind and health and degree of reliance on grantees); *DePaul v. DePaul*, 287 Pa.Super. 244, 429 A.2d 1192, 1194 (1981) (close family relationship not sufficient grounding for confidential relationship—must have display of special confidence to the extent that parties do not deal on equal terms) (citing *Truver v. Kennedy*, 425 Pa. 294, 229 A.2d 468 (1967); *Moreland v. Metrovich*, 249 Pa.Super. 88, 95, 375 A.2d 772, 775 (1977)); *Cahill v. Antonelli*, 120 R.I. 879, 390 A.2d 936, 939 (1978) (brother and sister stood in confidential relationship because sister always looked to brother for advice, entrusted him with her financial affairs, and considered him nominal head of the family); *Rehfeld v. Flemmer*, 269 N.W.2d 804, 807 (S.D.1978) (parent-child relationship is not sufficient to establish confidential relationship—must have proof of inequality of position between the parties); *Mills v. Gray*, 147 Tex. 33, 210 S.W.2d 985, 988 (1948) (parent-child relationship not inherently one of confidence, but confidential relationship may be found on basis of specific facts); *Lowther v. Lowther*, 578 S.W.2d 560, 562 (Tex.Civ.App.1979) (although brother-sister relationship not inherently confidential, parties in this case were bound by a confidential relationship because after sister's husband suffered a stroke, she relied on brother to manage all her property and financial affairs, placed utmost confidence in brother, and gave him authority to sign checks and general power of attorney) (citing *Oak Cliff Bank & Trust Co.*

*v. Steenberger*, 497 S.W.2d 489, 490 (Tex.Civ. App.1973); *Gorski v. Gorski*, 82 Wis.2d 248, 262 N.W.2d 120, 124-25 (1978) (family relationship standing alone does not constitute a confidential relationship, but is an important consideration) citing *Dombrowski v. Tomasino*, *supra*, 134 N.W.2d 420. *See also* citations at notes 32, 33. *But see*, *Henry v. Goodwin*, 266 Ark. 95, 583 S.W.2d 29 (1979).

Similarly, in an early decision in which the New York Court of Appeals held that the facts supported a finding of a confidential relationship between a mother and her son, that court focused on the twin elements of the reposal of confidence by one party and the resulting influence of the other. The Court opined:

The rule governing dealings between persons standing in fiduciary relations is applicable to parent and child, and courts carefully scrutinize them, to protect the latter against any undue advantage being taken by the former. The trust sought to be enforced in this case does not arise exclusively from the agreement, but from the agreement in connection with the other circumstances, the interest of the plaintiff in the land, the confidential relation of the parties, the youth and inexperience of the plaintiff, the fact that he acted without independent advice, and the injustice which would result in case the agreement should not be enforced.

*Wood v. Rabe*, 96 N.Y. 414, 426-27 (1884) (citations omitted). *See also*, *Goldsmith v. Goldsmith*, 145 N.Y. 313, 318, 39 N.E. 1067 (1895) (mother and son) ("The general rule was declared, in *Wood v. Rabe*, (96 N.Y. 425, 426), to be, that .... where the transaction is one between parent and child, and involves the greatest confidence on one side and the greatest influence on the other, the case is one in which equity may properly intervene"). In two subsequent cases, it appeared that the Court of Appeals premised its finding of the existence of a confidential relationship solely on the kinship of the parties. *See Sinclair v. Purdy*, 235 N.Y. 245, 139 N.E. 255 (1923) (siblings); *Foreman v. Foreman*, 251 N.Y. 237, 167 N.E. 428 (1929) (husband-wife). However, the court subsequently construed the holdings of those two cases, in line with its decisions in *Wood* and *Goldsmith*, to rest on the actual confidence-in-fact and the resulting influence that existed between the parties. *See Fraw Realty Co. v. Natanson*, 261 N.Y. 396, 185 N.E. 679, 680 (1933).

defendant. Thus, the Government concludes, when Reed traded on the basis of the information revealed to him by his father, Reed breached the duty of fidelity and confidence that had induced his father to make disclosures at the outset.

### 3. *Analysis*

■ In assessing the sufficiency of the Indictment, the parties would require this Court to choose between two petrified formulations of the meaning and scope of the concept "confidential relationship." The Court's endeavor, however, is not so limited. Instead, the Court concludes that in attempting to depict this concept in a fashion favorable to their respective points-of-view, each side has presented only a part of the picture. In a general sense, the term fiduciary or confidential relationship connotes a relation of trust as the basis of obligation and corresponding reliance or security. Such reliance may be either experienced unilaterally by one of the parties to the relationship or shared mutually by both members. A confidential relationship is based on the reposal of trust and confidence and envelopes both technical fiduciary relations as well as those informal alliances that arise whenever one person trusts in, and relies upon, another. The confidential relationship concept thus has reference to any relationship of blood, business friendship, or association in which the parties repose special confidence in each other and are in a position to have and exercise, or actually have and exercise influence over each other.

Beyond such generalities, what constitutes or defines a confidential relationship is frequently the subject of controversy. The relationship may exist under a great variety of circumstances, and purposely has been formulated ambiguously to embrace a myriad of situations. Consequently, save for its essence of fidelity and confidentiality, the articulating characteristics of such a relationship and the prerequisites

to its formulation must vary with the situations that the relationship simultaneously reflects and governs. *See* 36A *Fiduciary, supra*, at 385.[38]

Despite the seeming boundlessness of the confidential relationship construct, certain paradigmatic scenarios have emerged. As the cases reveal, a confidential relationship will be found to exist in those circumstances in which special confidence has been reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one investing the confidence. Similarly, it is fundamental that courts will find a confidential relationship in cases in which confidence is reposed on one side and there emerges a resulting superiority and influence on the other. *See* cases cited *supra* notes 32, 33, 37. Nevertheless, it is a mistake to attempt to distill from these situations general and unyielding principles by which to identify a confidential relationship no matter how diverse the context. For it is equally well settled that the existence *vel non* of such a relationship is ultimately a question of fact, the resolution of which rests on the particulars of the interactions between the parties and the texture of their specific relationship. *See* cases cited *supra* notes 32, 33, 37.

For this reason, the Court must reject, as have the commentators, defendant's argument that he could not be held to have been engaged in a confidential relationship with his father in the absence of proof that he dominated or controlled his father. This argument rests on just such an attempt to derive a rigidified definition of the confidential relationship construct from specific cases. To support his argument, defendant relies upon cases in which courts primarily exercised their powers in equity to set aside completed transactions on the ground that a disputed benefit was wrongfully obtained by means of fraud or undue influence. In this setting, the commentators

---

**38.** *See also* Bogert, *supra*, § 482 at 284–86 (footnotes omitted):

Equity has never bound itself by any hard and fast definition of the phrase "confidential rela-

tion" and has not listed all the necessary elements of such a relation, but has reserved discretion to apply the doctrine whenever it believes that a suitable occasion has arisen.

explain, the courts necessarily focus on the relative equality of the parties' positions, as well as on the degree of influence or dominance that the benefiting party could or did exercise over the other. *See, e.g.,* Palmer, *supra,* § 19.2, at 102–03, 106; Bogert, *Confidential Relations, supra,* 13 Cornell L.Q. at 246–47. In other circumstances, as for example, in the oral trust situations, the issue of dominance or inequality of the parties is not controlling, and the circumstances may favor finding a confidential relationship even when the positions of the parties approach equilibrium. *See, e.g.,* Palmer, *supra,* § 19.2, at 102–03, 106; Bogert, *Confidential Relations, supra,* 13 Cornell L.Q. at 246–47.

In analogizing the confidential relationship concept to that of a quasi-trust, Professor Bogert requires that "[t]he trust and confidence imposed by a *quasi-cestui* in a true confidential relation must be an extraordinary reliance which causes the *quasi-cestui* to drop his guard, abandon formalities, and deal with another in intimacy." Bogert, *Confidential Relations, supra,* 13 Cornell L.Q. at 245. Defendant's argument that Professor Bogert would not declare a confidential relationship to exist in the absence of dominance or superiority of influence by one of the parties is based on a misreading of that commentator's views. In an influential law review article, Bogert states expressly that dominance is not a prerequisite to a finding of a confidential relationship in all circumstances. Nevertheless, he explains, superiority of influence on behalf of the trusted party will necessarily result from the genesis of such a relationship. Rather than the eternal precondition of all confidential relationships, dominance or superiority of influence remains the ever-present byproduct of such associations. In Bogert's analysis, a distinction must be drawn between those elements that reveal the existence of a confidential relationship and those that would justify a court's setting aside a transaction on the grounds of undue influence or overreaching. He explains:

Dominance is not necessary to the origin of a trust and it should not be a prerequi-

site to the rise of the quasi-trust or confidential relation. It is not required in order to have an express trust that the trustee should tower over the *cestui* in physical, mental, or moral qualities. They may be on a parity. It is believed that the conception, previously referred to, that there can be no confidential relation without dominance or superiority of position, is due to confusion of thought. The mere fact that A is ignorant and inexperienced, and B educated and skilled in affairs, does not tend to prove that A and B are in a confidential relation. A may have trusted B and given B influence in A's affairs or he may not. If there has been such trust extended and influence acquired, it is immaterial whether the parties were equal or unequal as far as the existence of the confidential relation is concerned. But the disparity is important for another reason. It is evidence from which a finding of undue influence would be justified. If an aged, feeble, ignorant man conveys to an able-bodied, experienced business man, under an oral trust, a court may well treat the facts of disparity and the conveyance as some evidence of actual undue influence, or as raising a presumption of undue influence, or as creating a duty on the grantee to introduce evidence to show good faith, full disclosure and a fair price. But it is a misnomer to use "confidential relation" to describe the dominant character of the stronger. The stronger may have been trusted so as to come into a confidential relation, but the mere dominance does not show the trusting. There seems to have been a confusion of the quasi-trust and undue influence concepts at this point.

In arguing that dominance is not a relevant factor in determining the *existence* of a confidential relation, the writer does not wish to be understood as stating that, after a confidential relation has been created, superiority of influence on the side of the confidante is not a necessary result. Such superiority is an effect or consequence of the confidential rela-

tion, and not a cause of the origin of the confidential relation.

Bogert, *Confidential Relations, supra,* 13 Cornell L.Q. at 246–47 (emphasis in original).

Bogert's analysis was echoed half-a-century later by Professor Palmer, who concludes that the meaning and requisites of a confidential relationship in the oral trust context differ from those in situations of undue influence.

> In the latter instance the relief sought is rescission of the gift on the ground that it was *obtained* by a wrongful act. The presence of a confidential relationship is important only as it bears upon the issue of undue influence, and for this purpose it is important that the donee occupied the dominant position in the relationship. When a donee receives a gift for his benefit, he may well be in a confidential relationship with the donor, but that alone provides no reason for rescission of the gift. In contrast, if a grantor conveys land to a person who agrees orally to hold in trust for the grantor, the relevance of a confidential relationship between them is that it is inequitable for the grantee to retain title to the land through failure to perform his duty; hence, he holds the land as constructive trustee for the grantor. It is not necessary that the grantee be the dominant party to the relationship. In the one case the donor is awarded restitution of a gift he intended for the donee because the latter obtained it by wrongful conduct. In the other case there was no wrongful acquisition from the grantor; a gift to the grantee was not intended since he was to hold in trust for the grantor, and the latter obtains restitution

because of a wrongful retention of the title.

> A failure to differentiate between these two meanings of confidential relationship has given rise to an unnecessary confusion in some of the decisions....

Palmer, *supra,* § 19.3, at 108–09 (emphasis in original). *See also id.* § 19.2, at 103–05.

Consistent with this analysis is the judicial treatment of the confidential relationship concept in situations in which information such as a trade secret is disclosed in confidence and then used for personal advantage by the recipient of that information in breach of such confidence. In these circumstances, the courts regularly consider the parties to be bound by a confidential relationship, and hold that the unauthorized use by the entrusted party of this information violates that relationship. *See, e.g., E.I. Du Pont De Nemours Powder Co. v. Masland,* 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917).[39]

The decision of the Second Circuit in *Schreyer v. Casco Products Corp.,* 190 F.2d 921 (2d Cir.1951), *cert. denied,* 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952) is illustrative. In that case, the plaintiff after applying for a patent on an electric steam iron entered into negotiations with representatives of the defendant in an attempt to license the manufacture and sale by the defendant of the plaintiff's iron. During these negotiations, the plaintiff gave to the defendant blueprints and other detailed information about the construction and manufacture of the iron. The complaint alleged, and the trial court found, that the defendant then used this information to its own advantage without concluding a deal with the plaintiff. On the basis of these facts, the Second Circuit held:

39. *See also Dekar Industries, Inc. v. Bissett-Berman Corp.,* 434 F.2d 1304, 1305–06 (9th Cir. 1970), *cert. denied,* 402 U.S. 495, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971); *Atlantic Wool Combing Co. v. Norfolk Mills, Inc.,* 357 F.2d 866, 869–70 (1st Cir.1966); *Servo Corp. of Am. v. General Electric Co.,* 337 F.2d 716, 722–23, 725 (4th Cir. 1964), *cert. denied,* 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); *Heyman v. AR. Winarick, Inc.,* 325 F.2d 584, 586–87 (2d Cir.1963);

*Speedry Chem. Products, Inc. v. Carter's Ink Co.,* 306 F.2d 328, 332–34 (2d Cir.1962); *Pursche v. Atlas Scraper and Engineering Co.,* 300 F.2d 467, 483 (9th Cir.), *cert. denied,* 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962); *American Gage & Mfr. Co. v. Maasdam,* 245 F.2d 62, 64–65 (6th Cir.1957); *Franke v. Wiltschek,* 209 F.2d 493, 495–96 (2d Cir.1953); *Smith v. Dravo Corp.,* 203 F.2d 369, 376–77 (7th Cir.1953); *Telechron, Inc. v. Parissi,* 197 F.2d 757, 761 (2d Cir.1952).

Although the court found no express agreement to hold the information in confidence and not to use it if the negotiations for a license were not successful, there was a confidential relationship created between the parties by the disclosures which restricted the right of Casco to use them to the purposes for which the disclosures were made. *Hoeltke v. C.M. Kemp Mfg. Co.,* 4 Cir., 80 F.2d 912. The breach of this confidential relationship, enabling Casco to invade the plaintiffs' market, was unfair competition.

*Id.* at 924.

■ As a general rule, however, a confidential relationship will be found to exist only in situations in which it is shown that the confidence reposed by one party was actually accepted by the other. *See, e.g.,* 36A C.J.S. *Fiduciary, supra,* at 385. The mere unilateral investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship. Thus, the mere respect for the judgment of another or generalized trust in his character is usually insufficient grounding for a special relationship of trust and confidence. Consonant with this general principle, the courts in the trade secrets context, as elsewhere, have recognized that a person may not "by his gratuitous and unilateral act ... impose upon another a confidential relationship." *Official Airlines Schedule Information Service, Inc. v. Eastern Airlines, Inc.,* 333 F.2d 672, 674 (5th Cir.1964).[40] Instead, there must exist those circumstances or specific facts that justify the entrusting party in the belief that the other party shares a mutually recognized relationship of fidelity and confidence, and in which the recipient of a benefit or certain information acts not only in his own interest, but also for the benefit of the other party. As applied to the securities trading context, this principle directs that the recipient of nonpublic, confidential

information is prohibited from trading on that information only when it would breach a recognized confidential relationship for him to engage in such transactions. A minority of cases have held that such relationships need not involve a pre-existing fiduciary status and that a confidential relationship may be created by the disclosure of the information itself. *See* Longevoort, *The Fiduciary Principle, supra,* 70 Cal.L. Rev. at 30–31 n. 121 (and citations thereat). However, no court will find a confidential relationship in this context unless there is "some expectation of trust and confidence with respect to the information imparted, and the person receiving the information [has] assent[ed] at least implicitly to the expectation." *Id.* at 31. Moreover, the majority of cases have held that the mere exchange of confidential information will not suffice to create a confidential relationship. Rather, it is required that the relationship predate the exchange and that this association provide the context—if not the impetus—for such disclosures. Frequently, it is said that the relationship must inspire the disclosure, and that the relationship cannot merely emerge from the revelation's wake. *See, e.g.,* Bogert, *Confidential Relations, supra,* 13 Cornell L.Q. at 245; *Fraw Realty Co. v. Natanson, supra,* 185 N.E. at 680.

The decision of the Second Circuit in *Walton v. Morgan Stanley Inc., supra,* 623 F.2d 796 is instructive in this respect. In *Walton,* the court affirmed the dismissal of a shareholder's derivative suit against Morgan Stanley on behalf of Olinkraft, Inc. Morgan Stanley had been retained by Kennecott Copper Corporation, which was seeking to acquire a viable corporation. One company Morgan Stanley had considered was Olinkraft, which cooperated by supplying Morgan Stanley with highly favorable confidential earnings projections. Olinkraft had instructed Morgan Stanley that this information was to be used only in

---

**40.** *See also Lueddecke v. Chevrolet Motor Co.,* 70 F.2d 345, 348–49 (8th Cir.1934); *Vantage Point, Inc. v. Parker Bros. Inc.,* 529 F.Supp. 1204, 1217 (E.D.N.Y.1981), *aff'd mem.,* 697 F.2d 301 (2d Cir.1982); *Thomson Machinery Co. v. LaRose,* 306 F.Supp. 681, 695 (E.D.La.1969); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.,* 267 F.Supp. 726, 732–33 (S.D.Cal. 1967), *modified on other grounds,* 407 F.2d 288 (9th Cir.1969).

connection with the proposed acquisition by Kennecott and should be returned if that bid failed. Although Kennecott abandoned its offer to acquire Olinkraft, two other corporations made such a bid. After the announcement of the offer of the first corporation, Morgan Stanley purchased nearly 150,000 Olinkraft shares in the informed belief that a further bid would be made at a higher price. Subsequently, Morgan Stanley induced one of its clients to make such an offer. Ultimately, that corporation agreed with Olinkraft to a merger at a price per share that was considerably higher than the previous bids. Thereafter, the plaintiffs filed an action to induce Morgan Stanley to account to Olinkraft for the profits Morgan Stanley had made from its purchase of Olinkraft's stock after the abandonment of the Kennecott bid. The plaintiffs claimed that in relying on Olinkraft earnings projections revealed to Morgan Stanley in confidence, Morgan Stanley breached a fiduciary duty to Olinkraft.[41] The circuit court assumed that Morgan Stanley had known that the earnings projections were confidential but that it had received this information in an arm's-length transaction. On the basis of these facts, the court held that the complaint failed to allege a breach of fiduciary duty necessary to require an accounting and disgorgement of profits by Morgan Stanley. The court explained:

> Appellants contend that Morgan Stanley became a fiduciary of Olinkraft by virtue of the receipt of the confidential information. However, the fact that the information was confidential did nothing, in and of itself, to change the relationship between Morgan Stanley and Olinkraft's management. Put bluntly, although, according to the complaint, Olinkraft's management placed its confidence in Morgan Stanley not to disclose the information, Morgan Stanley owed no duty to observe that confidence. To be sure, in some instances the management of a potential target, such as Olinkraft,

might be required by its responsibility to the shareholders' interest to cooperate, and even to disclose confidential information, to a potential acquirer or a financial advisor who, as did Morgan Stanley, stands at arm's length. But that obligation, while it burdens management, which might therefore reasonably insist upon an agreement of confidentiality, does not change the relationship between the target and the acquirer or its advisor. Appellants' complaint alleges no such agreement or understanding.

*Id.* at 799 (footnote omitted).

Reed argues that *Walton* stands for the proposition that one party's expectation that another will keep confidences imparted to him, even if that expectation is fully understood by both sides, does not create any obligation of the other party to comply with that expectation. This proposition, Reed maintains, is directly applicable to the instant case and requires this Court to hold that even if defendant and his father understood that the information allegedly revealed to defendant by Gordon Reed was to be kept in confidence, defendant was not, as a result, bound by a confidential relationship, and therefore was free to use this information as he pleased. Reed concludes that "the Second Circuit's refusal [in *Walton*] to find any fiduciary duty clearly shows that without the factors of reliance and dependence required by all the cases, expectations of confidence, no matter how clear, do not create fiduciary duties." Reply Memorandum of Law Submitted in Support of Thomas C. Reed's Motion to Dismiss the Indictment at 8 n. * * (S.D.N.Y. Nov. 19, 1984).

Reed's reading of *Walton*, however, is inconsistent with both the language of that decision and the subsequent judicial interpretation of that case. Rather, in *Walton*, the Second Circuit held merely that the bargained for disclosure of confidential information by one party to another in the absence of a pre-existing relationship of

---

**41.** The plaintiffs did not allege that Morgan Stanley induced Olinkraft by deceit or misrepre-

sentation to disclose the earnings projections.

trust and confidence does not impose upon the recipient a duty of fidelity and confidentiality with respect to that information. As the court explained in the particular context of that case: "the fact that the information was confidential did nothing, in and of itself, to change the relationship between Morgan Stanley and Olinkraft's management." *Walton v. Morgan Stanley & Co., Inc., supra,* 623 F.2d at 799. The court made no holding with respect to—and did not even address—the issue whether a confidential relationship may be found in the absence of the elements of reliance and dependence.

This interpretation of *Walton* was adopted by the Supreme Court in *Dirks v. SEC, supra,* 103 S.Ct. at 3265 n. 22, which described *Walton* as "[a]n example of a case turning on the court's determination that the disclosure did not impose any fiduciary duties on the recipient of the inside information." Similarly, in *Moss v. Morgan Stanley Inc., supra,* 719 F.2d at 14, the Second Circuit indicated that *Walton* held merely "that an investment banker, representing an acquiring company, does not owe a fiduciary duty to the target simply because it received confidential information during the course of tender offer negotiations." The court explained:

> In rejecting Olinkraft's claim that Morgan Stanley violated section 10(b) by breaching a fiduciary duty owed to Olinkraft, we held that Morgan Stanley had engaged in arm's length bargaining with the target. Morgan Stanley did not become the target's fiduciary simply upon receipt of confidential information.

*Id.*

In the instant case, had it been conceded or proved that Reed and his father dealt with each other at arm's length, *Walton* may well have been controlling and may have required the dismissal of Counts One and Two. However, it is not contended that such is the nature of the relationship between defendant and his father. Rather, the Indictment alleges that Gordon and Thomas Reed shared an intimate relationship of trust and confidence that antedated the alleged disclosures at issue in this action. Thus, the Indictment charges, these disclosures were made to defendant in the context of a confidential relationship and subject to all the restrictions and duties attendant to such associations. In assessing the accuracy of these allegations, the trier of fact at trial must address a series of factual considerations that bear on the nature and scope of the relationship between defendant and his father.

Ultimately, then, the question of whether the parties to any association or transaction were bound by a confidential relationship generating special duties and obligations is an issue of fact and generally must be preserved for the trier of fact to determine after a complete review of all of the evidence. In making this decision, the jury is free to draw all inferences that reasonably follow from the evidence presented. Thus, even in the absence of an express agreement, it properly may be determined that a confidential relationship existed where the evidence reveals that conclusion to be in accord with the expectations and behavior of the parties. The repeated disclosure of secrets by the parties or by one party to the other may in the final analysis suffice to support a finding of a confidential relationship. However, the mere unilateral entrustment by one party to the other of a secret or confidence without the express or implied consent or encouragement of the other in the hope that the information will not be disclosed or used for other purposes will not support such a finding.

In the instant case, the Indictment alleges only that defendant and his father "had a special relationship of trust and confidence and frequently discussed business affairs in the expectation that [defendant] would keep his father's confidences." Indictment at ¶ 4. Drawing all reasonable inferences in favor of the Government upon the instant motion, the Court is unwilling to conclude that as a matter of law the allegations contained in the Indictment can under no circumstances support a finding that defendant and his father enjoyed a

confidential relationship that was breached in the instant case. Thus, it remains open to the Government to prove at trial that Reed and his father were bound by an agreement or understanding of confidentiality, express or implied, or that some regular pattern of behavior by defendant and his father generated on the part of those two men a justifiable expectation of confidentiality and fidelity. However, it must be made clear that, to substantiate the charges presented in the Indictment, the Government must establish that Gordon Reed disclosed to defendant inside information concerning the Socal merger proposal and that such disclosures were made in the context and as a result of a pre-existing confidential relationship between father and son. Absent such proof the Court will neither make nor tolerate—and the law will not support—a finding that defendant shared a confidential relationship with his father and that the call options transactions in the instant case constituted criminal fraud under the federal securities and wire fraud statutes.

In this connection, the Court must register its reluctance to apply the confidential relationship concept with the same liberality displayed by equity in cases of unjust enrichment. The Court's resolution is reinforced where, as here, the judicial system has already intervened to retrieve whatever benefit was allegedly obtained by improper means. See supra note 8. The charges confronting defendant are serious and the stigma they carry is substantial. Accordingly, at trial this Court will be vigilant to require the Government to prove beyond a reasonable doubt not merely that by engaging in the disputed transactions Reed disappointed and embarassed his father, but that these options trades breached an actual and pre-existing confidential relationship between father and son.[42]

### D. The Question of Injury

The second ground of Reed's attack on the sufficiency of Counts One and Two

need detain the Court but briefly. Specifically, Reed argues that even if the allegations in the Indictment could be construed to establish or imply the existence of a confidential relationship between Reed and his father, the first two counts of the Indictment must be dismissed because they fail to assert any legally cognizable injury or potential injury to the allegedly defrauded party, Gordon Reed. On the basis of the foregoing analysis of the relevant case law, the Court finds this argument unpersuasive.

■ It is by now well settled in this Circuit that an essential element of securities and mail or wire fraud prosecutions is proof of some actual or potential injury to the party allegedly defrauded by the defendant. See, e.g., United States v. London, 753 F.2d 202 at 205–206 (2d Cir.1985); United States v. Weiss, supra, at 783–84; SEC v. Materia, supra, at 201–202; United States v. Newman, supra, 664 F.2d at 17, 20; United States v. Von Barta, supra, 635 F.2d at 1006 n. 14; United States v. Dixon, 536 F.2d 1388, 1399 n. 11 (2d Cir.1976); United States v. Peltz, 433 F.2d 48, 53 (2d Cir.1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971); United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir.1970). However, it is also established that the object of a scheme to defraud need not be tangible or economic injury, see e.g., United States v. Weiss, supra, at 783–84; United States v. Von Barta, supra, 635 F.2d at 1006, and that the government need not allege or prove that the defendant in fact succeeded in defrauding the alleged victim, see, e.g., United States v. London, supra, at 205; United States v. Andreadis, 366 F.2d 423, 431 (2d Cir.1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967).

■ In the instant case, Reed argues that his father both as an individual and as

---

**42.** Even in the unjust enrichment cases, it is universally accepted that "[t]he burden of proving the existence of a confidential relation is on the person who asserts that it existed and who claims the benefit of it, and in some cases the courts have required proof by 'clear and convincing evidence.'" Bogert, supra, § 482 at 336 (footnotes omitted).

a director of Amax, stood to suffer no injury from Reed's stock option trades. He urges that the only adverse consequences to Gordon Reed from such transactions that defendant could reasonably have anticipated would have been disappointment and embarassment that Gordon Reed might harbor as a result of his son's trading for personal gain on the basis of disclosures Gordon Reed expected to remain confidential. It is inconceivable, Reed argues, that he could be held to have committed a federal felony on the basis of such injuries. He continues: "[a]s for Gordon's disappointment in Tom or the personal embarassment Gordon might feel, we do not believe the government will try to claim with a straight face that Rule 10b–5 and the wire fraud statute were intended to protect against parental distress and red cheeks." Reed Memo. at 48.

Instead, Reed contends, the only possible injury to Gordon Reed that could sustain the charges contained in the first two counts of the Indictment, is the possibility that Amax might have imposed some form of sanction against Gordon Reed, such as removing him from his position as a director, because of his disclosures to defendant. Reed argues that such injury is insufficient for two reasons. First, he argues, any such harm suffered by Gordon Reed would have been the direct result of his own "misconduct" in disclosing corporate secrets, and would not have been proximately caused by Reed's option transactions. Second, Reed maintains, such an injury is entirely speculative and, on theinstant facts, exceedingly unlikely.

In support of this argument, Reed attempts to distinguish the decisions of the Second Circuit in *Newman* and *Materia.* In both cases the defendants misappropriated confidential information from their employers. The circuit court held in both cases that the misuse of confidential information constituted fraud within the meaning of Rule 10b–5. Quoting the dissent of Chief Justice Burger in *United States v. Chiarella, supra,* 445 U.S. at 245, 100 S.Ct.

at 1123, the *Newman* court explained that the employees had stolen valuable nonpublic information entrusted to them in the utmost confidence. *See United States v. Newman, supra,* 664 F.2d at 17. The Court continued:

> Had appellant used similar deceptive practices to mulct [the employers] of cash or securities, it could hardly be argued that those companies had not been defrauded. By sullying the reputations of [the] employers as safe repositories of client confidences, [Newman] and his cohorts defrauded those employers as surely as if they took their money.
>
> . . . .
>
> In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. [Newman] would have had to be most ingenuous to believe that Congress intended to establish a less rigorous code of conduct under the Securities Acts.

*Id.* at 17–18 (citations omitted). *See also, SEC v. Materia, supra,* at 201; *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971); *Diamond v. Oreamuno,* 24 N.Y.2d 494, 499, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969).

Reed argues that both *Newman* and *Materia* are inapplicable to the instant context. Unlike the situation in this case, Reed urges, in *Newman* and *Materia,* the defendants themselves caused whatever injury actually or potentially was suffered by their employers. Moreover, he adds, in both of those cases the potential injuries to the employers were far more immediate, likely and harmful than the possibility in the instant case that Amax would require Gordon Reed to resign his directorship.

In so arguing, Reed mischaracterizes the basis of the charges against him. The gravamen of those charges is that Reed abused a confidential relationship with his father when Reed engaged in lucrative securities transactions made possible by dis-

closures made to him by his father in the expectation that Reed would preserve the confidentiality of that information. Thus construed, the actions upon which the Indictment is based and by which any legally cognizable injury was caused were entirely of Reed's own doing. Taken to the extreme, Reed's argument appears to suggest that because Gordon Reed's alleged disclosures were unauthorized, defendant was given free license to use the confidential information for personal gain. Such a position stands the basis of the instant prosecution on its head. The Government's position and the theory underlying Counts One and Two is that precisely because the disclosures to Reed were made about confidences and in confidence, Reed acquired a duty not to divert that information to his individual advantage.

Viewed in this light, the charges in Counts One and Two assert, as did the Government in *Newman* and the SEC in *Materia,* that Reed "misappropriated—stole to put it bluntly—valuable nonpublic information entrusted to him in the utmost confidence." *United States v. Chiarella, supra,* 445 U.S. at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting), *quoted in SEC v. Materia, supra,* 201–202 and *United States v. Newman, supra,* 664 F.2d at 17. Consistent with this analysis, it is open to the Government to prove that, by trading on the information revealed by Gordon Reed, defendant sullied the reputation of his father as the safe repository of corporate confidences, and thus defrauded Gordon Reed within the meaning of Rule 10b–5. In this regard, it matters not whether Gordon Reed actually suffered the injuries that conceivably could have resulted from defendant's alleged defalcation. It is similarly immaterial whether defendant intended his acts to bring shame and misfortune to this father, or even whether the father

wishes to see the son punished for any crimes the son may have committed. It is fundamental that the misappropriation of secret information, in violation of a confidential relationship, constitutes fraud and is unlawful. *See United States v. Newman, supra,* 664 F.2d at 18 (and citations thereat). Accordingly, this Court is unwilling to hold that, as a matter of law, the first two counts of the Indictment fail to allege facts from which it could be concluded that defendant's stock options trades could actually or potentially have caused legally cognizable injury to Gordon Reed.

## III. VENUE

In addition to his attack on Counts One and Two, Reed seeks dismissal of Counts Three and Four of the Indictment on the ground that as to prosecutions for the crimes charged therein venue does not properly lie in this district. Count Three charges Reed with perjury, in violation of 18 U.S.C. § 1623, on the basis of allegedly "false material declarations" made by Reed in his April 1982 deposition, held in San Francisco, California, in connection with the *O'Connor* litigation. *See* Indictment ¶ 13. In Count Four, Reed is charged with obstruction of justice, prohibited by 18 U.S.C. § 1503. This charge is premised on allegations that Reed created and used false handwritten notes "purporting to establish a lawful basis for his purchases of Amax options and to disguise the fact that he had made such purchases while in possession of unlawfully obtained non-public confidential information." *Id.* at ¶ 15. Despite the assertion in these counts that the crimes were committed "in the Southern District of New York and elsewhere," Reed argues, none of the acts allegedly constituting these offenses were committed in this district.[43] Thus, Reed concludes, both

---

**43.** Specifically, Reed maintains:

*nothing* in this entire case happened in the Southern District of New York except for the fortuitous circumstance that the American Stock Exchange, through which Amax options are traded, happens to be located here. Reed's options orders were placed from California and Virginia to his broker in California. His allegedly perjurious deposition testimony was given in California. His allegedly false notes were written in California and Virginia.

Reed Memo. at 55, n. * (emphasis in original).

Counts Three and Four must be dismissed for lack of venue.

■■ Pursuant to the Federal Rules of Criminal Procedure, venue in federal criminal prosecutions lies only in the district in which the alleged crime was committed. *See* Rule 18, Fed.R.Crim.P.[44] This rule derives from the constitutional venue provisions guaranteeing a criminal defendant the right to be tried in the district in which the crime was allegedly committed and by jurors of that district. *See* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI (the "constitutional venue provisions").[45]

■■ However, the Constitution merely fixes the "outer limits" of criminal venue, proscribing prosecution in a district other than the one in which the crime occurred. Abrams, *Conspiracy and Multi-Venue in Federal Criminal Prosecutions: The Crime Committed Formula*, 9 UCLA L.Rev. 751, 816 (1962). These venue guarantees do not indicate how the *locus delicti* is to be determined. Within the constitutional boundary, Congress is endowed with "plenary power" to fix venue in federal criminal prosecutions by defining where a particular crime is committed. *Id. See also*, Comment, *Multi-Venue and the Obscenity Statutes*, 115 U.Pa.L.Rev. 399, 423 (1967).

■■ However, when, as is true of the crimes charged in Counts Three and Four, the statute defining the offense fails to establish the proper venue for prosecutions under that statute, it devolves upon the trial court to determine the locality of the alleged offense. The Supreme Court has emphasized that such venue rulings must be made in light of the purposes of the

constitutional venue provisions. *See, e.g., Travis v. United States*, 364 U.S. 631, 634, 81 S.Ct. 358, 360, 5 L.Ed.2d 340 (1961); *United States v. Cores*, 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873 (1958); *United States v. Johnson*, 323 U.S. 273, 276, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944). The focus of this inquiry must be on "the locality of the offense and not the personal presence of the offender." *Armour Packing Co. v. United States*, 209 U.S. 56, 76, 28 S.Ct. 428, 433, 52 L.Ed. 681 (1908), *quoted in Travis v. United States, supra*, 364 U.S. at 634, 81 S.Ct. at 360. In making this determination, "the district court must ascertain both the nature of the offense and the location of the acts constituting it." *United States v. Chestnut*, 533 F.2d 40, 46 (2d Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). *See also Travis v. United States, supra*, 364 U.S. at 635, 81 S.Ct. at 361; *United States v. Cores, supra*, 356 U.S. at 408, 78 S.Ct. at 877; *United States v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946). Despite these broad principles, the Supreme Court has cautioned that "[t]he decisions are discrete, each looking to the nature of the crime charged." *Travis v. United States, supra*, 364 U.S. at 635, 81 S.Ct. at 361. With these general principles in mind, the Court turns to assess the proper venue for Counts Three and Four.

## A. *Count Three*

■■ Citing the decision of the Second Circuit in *United States ex rel. Starr v. Mulligan*, 59 F.2d 200, 202 (2d Cir.1932), Reed argues that it has long been the law in this circuit that the crime of perjury is

---

**44.** That rule provides in full:

Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

**45.** Although the sixth amendment does not literally provide for venue, it does define the "vicinage" from which jurors can be drawn. *See* Blume, *The Place of Trial of Criminal Cases:*

*Constitutional Vicinage and Venue*, 43 Mich.L. Rev. 59, 60 (1944). Moreover, the sixth amendment has consistently been interpreted as guaranteeing trial in the district in which the crime was committed. *See, e.g., Johnston v. United States*, 351 U.S. 215, 220, 76 S.Ct. 739, 742, 100 L.Ed. 1097 (1956); *Hyde v. United States*, 225 U.S. 347, 364, 32 S.Ct. 793, 801, 56 L.Ed. 1114 (1912); *In re Palliser*, 136 U.S. 257, 265, 10 S.Ct. 1034, 1036, 34 L.Ed. 514 (1890); 2 C. Wright, *Federal Practice and Procedure* § 301 at 190 (2d ed. 1982).

deemed to be committed in the district in which the false statement is uttered, and therefore that venue for perjury prosecutions is proper only in that district. The parties have not cited and the Court is unaware of any authority contrary to the holding in *Starr*, and thus, the Court is bound to apply that holding to the instant case. Consequently, the Court holds that venue does not lie in this district for prosecution of defendant for the perjury alleged in Count Three of the Indictment, and that that count must be dismissed.

In *Starr*, the circuit court refused to remove the defendant to the District of Columbia to answer an indictment returned against him in that district under the predecessor to 18 U.S.C. § 1001. The indictment charged that the defendant had signed and attested in New York City to an application for a civil service position, that this application contained materially false statements regarding defendant's qualifications for that position, "and that, with the intent to defraud the United States, he uttered and published these false statements as true to the United States Civil Service Commission in Washington, D.C." *United States ex rel. Starr v. Mulligan, supra,* 59 F.2d at 201. The court held that the indictment failed to charge the defendant with a crime committed in the District of Columbia. In reaching this decision, the Court considered the applicability of both the statute upon which the indictment was premised and on several related statutes. One such enactment was the general perjury statute, then 18 U.S.C. § 231. Venue under this statute, the court held, would not lie in Washington, D.C. on the facts of that case. The court explained:

> The indictment with which we are concerned alleges that the oath was taken in New York, but charges the commission of a crime in the District of Columbia where the application was published. It is well settled that the crime of perjury is complete the moment the oath is taken. It is true that the authorities cited did not involve the issue of venue as does the case at bar. But the reasoning upon which they rest is clearly inconsistent

with the view that a second crime of perjury was committed upon the publication of the false application.

*Id.* at 202 (citations omitted).

This determination was echoed by the United States Court of Appeals in the D.C. Circuit in *Jones v. Gasch,* 404 F.2d 1231, 1234-5 n. 11 (D.C.Cir.1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968). In that case, the petitioner had instituted a mandamus proceeding in the court of appeals to compel a district judge to transfer the petitioner's perjury prosecution from the District of Columbia to a forum that would be more convenient for the petitioner. The court held that the district judge had not abused his discretion in denying the petitioner's motion to transfer and that a writ of mandamus would not issue. In a footnote the court observed in part:

> We may, however, readily dispose of any notion that the Government, in instituting the instant prosecution in this jurisdiction, was exercising an option as to where the proceedings would occur. Venue in a perjury case lies properly only where the perjurious statement is supposed to have been made. The offenses with which petitioner is charged afforded the Government no choice, and no possibility to shop for a forum.

*Id.* at 1235 n. 11.

In the instant case, the facts as alleged in the Indictment demonstrate that all of the activity relevant to the charge in Count Three occurred beyond the confines of the Southern District of New York. In particular, of controlling importance is the fact that the disputed testimony was given under oath during deposition in San Francisco. Applying the holding in *Starr* to these facts, the Court must conclude that venue for a prosecution for perjury based upon such testimony lies only in the Northern District of California, of which San Francisco is a part.

The Government argues, however, that because Reed's testimony was given during the course of discovery proceedings in the

*O'Connor* litigation, Reed can be prosecuted for perjury in this district. Specifically, the Government contends that the federal perjury statute authorizes Reed's prosecution here because his deposition testimony constituted false material declarations in a proceeding "ancillary to" a civil action in this district, within the meaning of that statute. *See* 18 U.S.C. § 1623(a). The Government's contention is correct insofar as it asserts that Reed's deposition could be considered under section 1623(a) to be a proceeding ancillary to a proceeding before a judge of this Court. *See Dunn v. United States*, 442 U.S. 100, 110, 99 S.Ct. 2190, 2196, 60 L.Ed.2d 743 (1979); *United States v. Scott*, 682 F.2d 695, 698 (8th Cir.1982) (terms "deposition" and "ancillary proceeding" are synonomous under perjury statute). However, the "ancillary proceeding" language in section 1623(a) merely identifies those proceedings to which the perjury statute applies and does not purport to address the issue of venue for prosecutions under that act. The Government has not offered, and neither the legislative history of nor the cases addressing section 1623 provide, any support for the position advanced by the Government herein.

In fact, had Congress intended to address the issue of venue for proceedings under section 1623, it is unlikely that it would have done so in such an oblique fashion. This observation is especially telling in light of the Second Circuit's holding in *Starr*, which flatly contradicts the Government's position. The perjury statute which the *Starr* court addressed was the predecessor to the general perjury statute, 18 U.S.C. § 1621. Count Three of the Indictment charges Reed with perjury pursuant to the more recently enacted 18 U.S.C. § 1623, which prohibits false statements in any proceeding before or ancillary to any court or grand jury of the United States. *Id.* § 1623(a). Congress enacted section 1623 as part of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922, "to facilitate perjury prosecutions and thereby enhance the reliability of testimony before federal courts and grand juries." *Dunn v. United States, supra,* 442 U.S. at 107, 99 S.Ct. at 2194. *See also* S.Rep. No. 617, 91st Cong., 1st Sess. 58–59 (1969). That section was passed to alleviate the evidentiary problems in demonstrating perjury under the then existing federal statute, 18 U.S.C. § 1621. As the Supreme Court explained:

> In particular, Congress focused on the two-witness rule, under which "the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused." *Hammer v. United States*, 271 U.S. 620, 626 [46 S.Ct. 603, 604, 70 L.Ed. 1118] (1926); *accord, Weiler v. United States*, 323 U.S. 606, 608–610 [65 S.Ct. 548, 549–50, 89 L.Ed. 495] (1945). See S.Rep. No. 91–617, pp. 57–59 (1969).

*Dunn v. United States, supra,* 442 U.S. at 108 n. 6, 99 S.Ct. at 2195 n. 6.

Nothing in the language or legislative history of section 1623 reveals any intent on the part of Congress to change—or even address—the rules governing venue for perjury prosecutions. Most readily apparent is Congress' failure to expressly address in 1623 the issue of venue and to provide that prosecutions under that act could be held in districts other than the one in which the false statements were uttered. It can be concluded from such legislative silence that Congress intended to leave unchanged the rule that venue for perjury prosecutions lies only in the district in which the false statements allegedly were made. *See, e.g., Director, Office of Workers' Compensation Programs, United States Dept. of Labor v. Perini North River Assoc.,* 459 U.S. 297, 103 S.Ct. 634, 649, 74 L.Ed.2d 465 (1983); *Burns v. Equitable Life Assurance Soc'y of the United States,* 696 F.2d 21, 22 (2d Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 336, 78 L.Ed.2d 306 (1983); *Air Transp. Ass'n of Am. v. Professional Air Traffic Controller's Org.,* 667 F.2d 316, 321 (2d Cir.1981) (courts may "presume that Congress is aware of settled judicial constructions of existing law."). In this connection, it is significant that, as part of the same act—the Organized Crime Control Act of 1970—

and on the same day that Congress enacted section 1623, Congress promulgated special venue provisions for the Racketeer Influenced and Corrupt Organizations Act. *Compare* Pub.L. No. 91–452, Title IV, § 401(a), 84 Stat. 932 (enacted as 18 U.S.C. § 1623), with Title IX, § 901(a), 84 Stat. 941–44 (enacted as 18 U.S.C. § 1961–68), (Oct. 15, 1970). The Government may not, nor does it attempt to, analogize to decisions under 18 U.S.C. § 1001 to refute the argument that venue for the charges contained in Count Three will not be in the Southern District of New York. Section 1001 proscribes making false, fictitious or fraudulent statements in a matter within the jurisdiction of any department or agency of the United States, and provides in full:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The courts have held that alleged violations of that section may be prosecuted in either the district in which the false statement was prepared and mailed or in the district in which the offense was completed, *i.e.,* where the federal agency receives or acts upon the statement. *See, e.g., Travis v. United States, supra,* 364 U.S. at 635–37, 81 S.Ct. at 361–62 (venue in place of receipt and filing); *United States v. Herberman,* 583 F.2d 222, 225–27 (5th Cir.1978); *United States v. Candella,* 487 F.2d 1223, 1227–28 (2d Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 36 L.Ed.2d 872 (1974) (venue proper in either district); *United States v. Polin,* 323 F.2d 549, 557–58 (3d Cir.1963)

(venue permissible in place of filing); *United States v. Culoso,* 461 F.Supp. 128, 135 (S.D.N.Y.1978), *aff'd mem.,* 607 F.2d 999 (1979) (citing cases). *See also, Haddad v. United States,* 349 F.2d 511 (9th Cir.), *cert. denied,* 382 U.S. 896, 86 S.Ct. 193, 15 L.Ed.2d 153 (1965); *United States v. Miller,* 246 F.2d 486 (2d Cir.), *cert. denied,* 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261 (1957); *De Rosier v. United States,* 218 F.2d 420 (5th Cir.), *cert. denied,* 349 U.S. 921, 75 S.Ct. 660, 99 L.Ed.2d 1253 (1955); *United States v. Valenti,* 207 F.2d 242 (3d Cir. 1953); *United States v. Uram,* 148 F.2d 187 (2d Cir.1945); *United States v. Williams,* 437 F.Supp. 1047 (W.D.N.Y.1977); *United States v. Chestnut,* 399 F.Supp. 1292 (S.D.N.Y.1975), *aff'd,* 533 F.2d 40 (2d Cir.1976), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1977). These cases indicate that the offense under section 1001 is committed in the district in which the false statement is brought within the jurisdiction of the relevant federal department or agency, *i.e.,* the place in which the statement was filed or received. However, in reliance upon the venue provisions for continuing offenses, 18 U.S.C. § 3237(a),[46] the courts hold that venue for prosecutions under section 1001 is also proper in the district in which the events that culminated in the commission of the offense were set in motion, *i.e.,* the place in which the false statements were prepared. *See, e.g., United States v. Herberman, supra,* 583 F.2d at 225–27; *United States v. Miller, supra,* 246 F.2d at 487–88; *De Rosier v. United States, supra,* 218 F.2d at 423; *United States v. Chestnut, supra,* 399 F.2d at 1297. In contrast, the crime of perjury under section 1623 is complete when the oath is taken, and thus is not subject to the continuing offense venue of section 3237(a). Stated simply, then, even if Reed did commit perjury as charged in Count Three, that crime began and ended in San Francisco

---

**46.** Section 3237(a) provides in part:

Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and

completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

and may not be prosecuted in the Southern District of New York.

### B. *Count Four*

██ The Indictment charges in Count Four that Reed willfully and corruptly endeavored to obstruct the due administration of justice in the *O'Connor* litigation "by creating and using false and misleading documentation, to wit [certain] handwritten notes," in violation of 18 U.S.C. § 1503. Indictment at ¶ 15. It is undisputed that these notes were created in California and Virginia; none of them were made in New York. These notes were disclosed in Chicago, Illinois, and Washington, D.C., to counsel for the plaintiffs in the *O'Connor* litigation, prior to Reed's deposition in San Francisco in connection with that action. Consequently, Reed argues that the alleged endeavor to obstruct justice could not have taken place in New York, and that venue for the prosecution for this purported offense does not lie in the Southern District of New York.

The courts have struggled to determine venue for prosecutions involving obstruction of justice.[47] Although they acknowledge the constitutional requirement that venue be laid in the district where the crime allegedly was committed, the courts are divided as to whether the crime of endeavoring to obstruct justice is committed only in the district in which the defendant's acts occurred,[48] or whether venue may lie in the district in which the defendant intended those acts to have their effect.[49] Those cases that have held venue properly laid in the district of the target proceeding have generally reserved decision on the question of whether venue might also lie where the defendant allegedly has acted.[50] One district court, however, has held that the district of the target proceeding is the only permissible place for trial. *See United States v. Elliott, supra,* 446 F.Supp. at 210.

Despite this discord among the circuits, the path this Court must follow has already been marked. The Second Circuit has held that venue for prosecutions under section 1503 is proper only in the district in which the obstructive acts allegedly occurred. *See United States v. Brothman, supra,* 191 F.2d at 72. *See also United States v. Wilson, supra,* 565 F.Supp. at 1423.[51] In *Brothman,* the defendant was convicted

---

**47.** The general obstruction of justice provision is currently found at section 1503. Prior to recent amendments, section 1503 covered interference with witnesses, as well as jurors and court officers. *See* S.Rep. No. 532, 97th Cong., 2d Sess. 14 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2515, 2520. Most of the obstruction of justice cases discussed, *see infra* notes 48, 49, involved interference with witnesses and arose under the earlier version of § 1503. Such cases would not be brought under the "Victim and Witness Protection Act of 1982," 18 U.S.C. § 1512. Although this statute effects significant changes in the law, *see generally* S.Rep. No. 523, *supra,* it does not purport to settle the venue dispute that has arisen under the older statute.

**48.** *See United States v. Nadolny,* 601 F.2d 940, 942–43 (7th Cir.1979) (decided under 18 U.S.C. § 1510); *United States v. Swann,* 441 F.2d 1053, 1055 (D.C.Cir.1971); *United States v. Brothman,* 191 F.2d 70, 72–73 (2d Cir.1951). *See also United States v. Wilson,* 565 F.Supp. 1416, 1423–25 (S.D.N.Y.1983) (addressing charges under 18 U.S.C. §§ 1512 and 1513); *United States v. Bachert,* 449 F.Supp. 508, 509 (E.D.Pa.1978).

**49.** *See United States v. Johnson,* 713 F.2d 654, 658–59 (11th Cir.1983), *cert. denied,* — U.S.

——, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984); *United States v. Kibler,* 667 F.2d 452, 454 (4th Cir.) *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); *United States v. Barham,* 666 F.2d 521, 524 (11th Cir.), *cert. denied,* 456 U.S. 947, 102 S.Ct. 2015, 72 L.Ed.2d 470 (1982); *United States v. Tedesco,* 635 F.2d 902, 905 (1st Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981); *United States v. O'Donnell,* 510 F.2d 1190, 1195 (6th Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). *See also United States v. Culoso,* 461 F.Supp. 128, 135 n. 10 (S.D.N.Y.1978), *aff'd mem.,* 607 F.2d 999 (1979); *United States v. Elliott,* 446 F.Supp. 209, 210 (W.D.Va.1978); *United States v. Essex,* 275 F.Supp. 393, 397 (E.D.Tenn.1967), *rev'd on other grounds,* 407 F.2d 214 (6th Cir.1969).

**50.** *See United States v. Kibler, supra,* 667 F.2d at 455, n. 2; *United States v. Barham, supra,* 666 F.2d at 524, n. 2; *United States v. Tedesco, supra,* 635 F.2d at 906 n. 5; *United States v. O'Donnell, supra,* 510 F.2d at 1193.

**51.** *But see United States v. Culoso, supra,* 461 F.Supp. at 135 n. 10.

of, *inter alia,* endeavoring to obstruct justice under the predecessor to section 1503 for attempting to suborn a federal grand jury witness. The prosecution had been brought in the Southern District of New York, where the grand jury had been empaneled, even though all the alleged obstructive acts occurred in the Eastern District of New York. The sole issue raised by the defendant on appeal from the obstruction conviction was that venue was not properly found in the Southern District of New York. In response, the Government asserted only that the defendant had waived the right to raise the venue defense because he had gone to trial in the Southern District without objection. The Second Circuit rejected this waiver argument and in reliance on a criminal defendant's right to be tried where the crime had been committed, reversed the conviction for lack of venue. This Court, of course, is bound by that ruling, and must hold that venue for prosecutions under section 1503 properly lies only in the district in which the alleged obstructive acts occurred.

The Government argues that *Brothman* is not controlling in the instant case because "the propriety of venue in the affected district was neither briefed nor discussed" in that case. Government's Memo. at 25. This argument is patently contrary to the express language of that decision and borders on the frivolous. The sole contention with which the Second Circuit had been confronted in *Brothman* was that venue did not properly lie in the district in which the defendant had been tried. In fact, the court reversed the defendant's conviction for precisely that reason.

Support for this reading of the decision in *Brothman* can be found among the decisions of other circuit courts that have addressed the question of venue in obstruction of justice prosecutions. At least two of those decisions have considered *Brothman* to be controlling authority in the Second Circuit for the proposition that venue

in obstruction of justice prosecutions is properly found only in the district in which the allegedly obstructive acts were committed. *See United States v. Kibler, supra,* 667 F.2d at 454; *United States v. Tedesco, supra,* 635 F.2d at 906. Moreover, in *United States v. Wilson, supra,* 565 F.Supp. at 1423–24, Judge Weinfeld unequivocally accepted the *Brothman* holding as binding precedent in this circuit. In *Wilson,* the indictment charged the defendant with taking measures while in federal custody to cause the murder of witnesses and others involved in criminal prosecutions pending against him in other districts. The defendant moved to dismiss the seventeen count indictment, arguing, *inter alia,* that venue for the obstruction of justice charges rested only in the district in which the target proceedings were pending. Judge Weinfeld rejected this argument on the authority of *Brothman,* explaining that "[t]his Court, of course, is bound by the ruling of the Second Circuit." *Id.* (footnote omitted). The district court then analyzed the issue as if it were one of first impression and concluded that

> venue is proper in the district where the acts were committed even though intended to obstruct justice in an official proceeding pending in another district. The essence of the crime is tampering with or retaliating against a witness with intent to obstruct justice wherever the proceeding is pending. The crime is the offender's attempt with intent to obstruct justice, and whether or not the effort succeeded is immaterial. And where an accused paid a sum of money in this District to induce a witness not to testify upon a trial in another district, justice was obstructed in that district; but the inducing act was performed in this District and the crime was committed here.

*Id.* at 1424.[52]

Even in the absence of binding Second Circuit authority, this Court, after a review

---

**52.** Turning to the charges brought against the defendant under the newly enacted Victim and Witness Protection Act, 18 U.S.C. §§ 1512, 1513, the court in dictum remarked:

> While thus far no case has so held, this Court is of the view that the recently enacted Victim and Witness Protection Act, upon which various counts here under challenge are based, is

of the conflicting lines of cases and competing considerations, would still hold that venue for prosecutions under section 1503 lies only in the districts in which the allegedly obstructive acts occurred.[53] This holding is consistent with the legislative history and development of section 1503 and its predecessors, and best effectuates the policies and purposes behind the constitutional venue provisions. Moreover, the courts of appeals of at least two other circuits, as well as several recent commentators, have agreed with the Second Circuit that venue for obstruction of justice prosecutions lies only in the district in which the obstructive acts allegedly occurred. *See supra* note 48.[54]

The first decision after *Brothman* to address the issue of venue under section 1503 was *United States v. Swann, supra,* 441 F.2d 1053. In *Swann,* the defendant was charged in the District of Columbia with endeavoring to influence a witness in violation of section 1503. The indictment in that case alleged that the defendant, after being charged with rape and assault in the District of Columbia, crossed into Maryland and wounded the complainant by shooting her with a pistol. The defendant moved to dismiss the indictment on the ground of improper venue. The D.C. Circuit agreed, concluding that because all of the acts alleged in the indictment occurred in Maryland, venue under section 1503 lay only in that district. The court explained that "[t]he mold and form of the appellant's crime was finally cast in Maryland; it could not be altered by anything that might happen thereafter in the District of Columbia." *Id.* at 1055. That the defendant had intended his acts to affect the complainant's testimony in the rape prosecution in the District of Columbia was not, in the court's opinion, sufficient to establish venue in that district.[55]

By contrast, a number of other circuits have disagreed with the holdings in *Brothman* and *Swann,* and have held that venue

---

broad enough to permit a prosecution either in the district where the acts occurred or in the district where its impact was intended, whether or not it succeeded.

*Id.* (footnote omitted).

This observation, however, does not lend support to the Government's position. In this statement, the *Wilson* court had expressly confined its comments to the issue of venue under sections 1512 and 1513. With respect to the propriety of venue under section 1503—the issue that confronts this Court on the instant motion—Judge Weinfeld held on the strength of *Brothman* that venue could property lie only in the district in which the obstructive acts allegedly occurred. Moreover, as authority for its conclusion that sections 1512 and 1513 allow for more expansive venue than does section 1503, the court explicitly relied upon the legislative history for the Victim and Witness Protection Act. *See id.* at 1424 n. 20. That history reveals Congress' intent to "strengthen existing legal protections for victims and witnesses of Federal crimes." S.Rep. No. 532, *supra,* at 9, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2515.

**53.** In the instant case the parties have not argued and, thus, this Court has no occasion to consider the question whether in situations in which the obstructive acts occurred in two or more districts, a prosecution under section 1503 may be brought in any of those districts. It is at least arguable under the general venue provisions for continuing offenses, 18 U.S.C. § 3237(a) that in those circumstances venue might properly lie in more than one district. *See supra* note 46. Such considerations, however, cannot alter or affect this Court's holding that where the obstructive acts occurred in a district or districts other than the district of the target proceeding prosecutions under section 1503 may not be held in the district of the target proceeding.

**54.** In particular, support for this Court's holding can be found in two recent law review articles that have undertaken a more extensive analysis of this question. *See* Note, *Venue in Constructive Contempt Prosecutions Under 18 U.S.C. § 1503: An Act-Oriented Approach ("An Act-Oriented Approach"),* 63 B.U.L.Rev. 919 (1983); Note, *Criminal Venue in the Federal Courts: The Obstruction of Justice Puzzle ("The Obstruction of Justice Puzzle"),* 82 Mich.L.Rev. 90 (1983). Both articles review the legislative development and judicial interpretation of section 1503 and conclude that the language and history of that statute as well as the policies behind the constitutional venue provisions require laying venue in the district in which the obstructive acts occurred.

**55.** In support of this view, the court observed that even if the Government had subsequently abandoned the rape prosecution in the District of Columbia, the defendant would still be subject to prosecution in Maryland on the section 1503 charges.

for obstruction of justice prosecutions properly may lie in the district in which the target proceeding is pending. *See supra* note 49. Among these decisions, the most extensive treatment of the venue issue is found in the decisions of the Sixth Circuit in *United States v. O'Donnell, supra,* 510 F.2d 1190, and of the First Circuit in *United States v. Tedesco, supra,* 635 F.2d 902. These decisions reject the holding and analysis in *Swann* and *Brothman* for a pair of reasons. First, the *O'Donnell* and *Tedesco* courts hold that the focus of section 1503, as revealed by the language of that enactment, is not on the conduct or acts constituting the offense, but instead on the effect of such misconduct on the administration of justice in the target proceeding. Thus, it is concluded that the crime is committed, for venue purposes, where the offender intends that justice be obstructed, *i.e.,* in the district of the target proceeding. Second, these decisions posit that the legislative history of section 1503 indicates that that statute was intended to punish constructive contempts of court. On the basis of this analysis of the legislative history, the *O'Donnell* and *Tedesco* courts argue that section 1503 was enacted to enable courts to punish contempts of their authority—including endeavors to obstruct justice—even when the offending acts occurred outside the district in which the court sits. The Court evaluates in turn the arguments presented in *O'Donnell* and *Tedesco.*

### A. *United States v. O'Donnell*

In *O'Donnell,* the defendant was indicted in the Western District of Tennessee for endeavoring to obstruct justice in a mail fraud proceeding that was pending against him in that district. The obstruction charge arose out of the defendant's efforts in the Northern District of Texas to hire an assassin to kill a witness who was sched-

uled to testify against the defendant in the mail fraud prosecution. On appeal from his conviction on the obstruction charge, the defendant argued that, since all of the relevant acts had occurred in Texas, venue could not properly lie in the Western District of Tennessee. The Sixth Circuit rejected this contention, and affirmed the conviction.

The first argument advanced by the Sixth Circuit in support of this holding was based on the court's examination of the language of section 1503. In particular, the court explained that a textual analysis of that statute demonstrates that the focus of section 1503 is on the intended effect of the obstructing activity, and not on the means employed to achieve that end. The court then rejected the analysis of the D.C. Circuit in *Swann* because of that decision's asserted failure to consider two factors that the Sixth Circuit deemed significant with respect to the legislative history of section 1503.[56]

The *O'Donnell* court's first argument is premised on the proposition that section 1503 condemns in a general fashion all forms of obstruction no matter the locus of occurrence, but specifically focuses on the effect of the obstruction, which can occur only in the district of the target proceeding. On the basis of this observation, the court distinguished the holding of the D.C. Circuit in *Swann,* claiming that "the *Swann* court failed to recognize the distinction between Sec. 1503 and other types of crimes referred to in the court's opinion." *United States v. O'Donnell, supra,* 510 F.2d at 1193. For example, the Sixth Circuit argued, *Swann* incorrectly relied on cases determining that venue for prosecutions under the Public Corruption Act, 18 U.S.C. § 201, lies in the district in which the bribe is passed or the attempt to bribe is made.[57] According to the *O'Donnell*

---

**56.** This analysis has also been adopted by the courts of appeals for the First, Fourth, and Eleventh Circuits. *See supra* note 49.

**57.** 18 U.S.C. § 201(b) provides:

(b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value

to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—

(1) to influence any official act; or

court, the essence of the offense under the bribery statute is the actual transfer or offer to transfer of money or other thing of value, and not the effect that such transfer will have or is intended to have on the recipient. The court thus concluded that venue for prosecutions under section 201 properly lies only in the district in which the physical acts occurred. The place of the intended effect upon the recipient of the bribe is irrelevant for venue purposes, the Sixth Circuit claimed, because the intent to influence that recipient does not depend upon where the recipient is at the time of the crime. In contrast, the court explained:

> under Sec. 1503, any corrupt attempt, regardless of the means employed, whether by the offer of money or otherwise, to impede or obstruct the due administration of justice is made a punishable offense. It cannot be said that the focus of the statute is exclusively upon any possible means which may be employed. Rather, it is upon the intended effect of any corrupt conduct of whatever description upon the administration of justice by the courts. Under Sec. 1503, the *effect* of corrupt conduct is always intended to occur only at one place; viz., the place or district in which the court sits or in which the proceeding is pending.

*Id.* at 1194 (emphasis in original). Consequently, the court concluded, since the focus of section 1503 rests on the intended effect of the obstructive acts, the crime is committed where this effect can be said to occur, *i.e.*, the district in which the target proceeding is pending.

The textual analysis advanced in *O'Donnell*, however, departs from the express language of section 1503, and, thus, misconstrues the primary focus of that statute. Similarly, the asserted distinction between section 1503 and the bribery act, upon which the O'Donnell court relied, is not supported by the provisions of either enactment. Specifically, section 1503 identifies the types of acts it proscribes and does not simply condemn all forms of corruption or obstruction, whatever the description. In its opening sentence that statute expressly forbids the use of "threats or force, or ... any threatening letter or communication" designed to interfere with pending judicial proceedings.[58] These acts, no less than the acts proscribed by section 201, may be said to occur in a particular district and may thus be traced, for venue purposes, to a particular locale. Moreover, both sections 201 and 1503 expressly specify the intended effects of the proscribed acts at which the statutes are directed. In particular, section 201(b) condemns the offer or promise of anything of value with one of three specific intentions: the intent to influence any official act, the intent to influence a public official to participate in any fraud upon the United States, or the intent to induce a public official to violate his lawful duties. By virtue of the enumeration of these elements, it is reasonable to conclude that section 201(b) focuses upon the intended effect of the precluded offenses. Nevertheless, because venue for criminal pro-

---

(2) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude, in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of his lawful duty.

**58.** In addition one commentator explains, 18 U.S.C. § 1512, which supplements section 1503, may be helpful in interpreting the language and focus of section 1503. In section 1512, Congress proscribed "intimidation," "physical force,"

"threat[s]," "misleading conduct," and "harass[ment]." The commentator concludes that "[t]he availability of this specific interpretive aid renders the type of acts condemned far less general than the *O'Donnell* court suggests." *The Obstruction of Justice Puzzle, supra,* 82 Mich.L. Rev. at 102 n. 61. *See United States v. Stewart,* 311 U.S. 60, 64, 61 S.Ct. 102, 105, 85 L.Ed. 40 (1940) (acts of Congress that concern the same subject matter are in *pari materia,* and the "later act can therefore be regarded as a legislative interpretation of the earlier act in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting") (footnote and citations omitted).

ceedings must lie in the district in which the offense is committed, prosecutions under section 201 may be held—as the *O'Donnell* court acknowledged—only in the place in which the improper transfer or offer to transfer was made. Similarly, regardless of whether the language of section 1503 is directed at the obstructive acts or the intended effects of such activity, venue for prosecutions under that enactment must lie in the place in which the obstructive acts occurred. This analysis reveals, then, that the analytical approach advanced in *O'Donnell*, which attempts to establish venue for prosecutions under section 1503 by deriving the "focus" of that statute from the text of the enactment, is at best inconclusive.[59]

In support of its textual analysis, and as the primary underpinning for its holding, the *O'Donnell* court observed that the legislative history of section 1503 reveals Congress' intent to allow for obstruction of justice prosecutions in the district in which the target proceeding was pending. First, the court observed that legislative history of section 1503 indicates that that section was originally directed at constructive contempts of court.[60] Heeding "the traditional idea that a court, within the limits of statutory modifications, should have the power to deal with contempts of its own authority," *id.* at 1195, the court reasoned that in passing section 1503, Congress intended to allow prosecutions under that statute in the district in which the proceeding the defendant endeavors to obstruct is pending. Second, the Sixth Circuit read the decision of

the United States Supreme Court in *Nye v. United States*, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941), as implying that the criminal prosecution for a constructive contempt could lie in the district in which the underlying action had been brought even when the contemptuous conduct had occurred in another district. In *Nye*, the defendants in a civil action were summarily adjudicated in contempt of court for exerting improper influence over an illiterate and feeble-minded plaintiff to obtain the dismissal of the action. All the contemptuous acts occurred in a district different from the one in which the action had been pending. The Supreme Court reversed the convictions, holding that the court could not exercise summary power over a defendant whose obstructive acts occurred outside the court's presence. Instead, the Court held, the defendants were entitled to a full criminal trial. Although the Court did not identify the proper forum for that trial, the *O'Donnell* court interpreted the *Nye* decision to imply that the trial court could hear the contempt prosecution even though all the disputed acts occurred in another district. On the basis of this interpretation, the Sixth Circuit concluded that *Nye* "is clear authority" for laying venue for section 1503 prosecutions in the district in which the target proceedings was pending. *United States v. O'Donnell, supra,* 510 F.2d at 1195.

The characterization of section 1503 as a constructive contempt statute is reflected in its development and legislative history. The origins of that statute can be traced to

---

**59.** One commentator has noted that even if the *O'Donnell* court correctly concluded that section 1503 focuses on the effect of the obstructive conduct and not the acts themselves, it does not necessarily follow that venue must lie in the district in which the target proceeding is pending:

In the statute defining murder, for example, Congress plainly focused on the intended effect of the fatal act over the means used to carry out the offense. Congress nevertheless determined that venue should lie "where the injury was inflicted, or the poison administered or other means employed which caused the death, without regard to the place where the death occurs." It is not clear whether

section 1503 does focus on intended effect over acts. Even if it does, Congress' handling of the statute defining murder suggests that the venue implications of that focus are uncertain.

Note, *The Obstruction of Justice Puzzle, supra,* 82 Mich.L.Rev. at 103 (quoting 18 U.S.C. § 3236) (footnotes omitted).

**60.** The *O'Donnell* court's analysis of the legislative history and development of section 1503 was embraced as persuasive in *United States v. Tedesco, supra,* 635 F.2d 902, discussed *infra* at 73. The Court's evaluation of and disagreement with the *O'Donnell* analysis, of course, are fully applicable to the reasoning in *Tedesco*.

the Judiciary Act of 1789, Ch. 20, 1 Stat. 73 (1789). In that act, Congress established the lower federal courts and granted those courts broad discretionary power to remedy contempts of their authority.[61] Thus, until the early nineteenth century, conduct now cognizable under section 1503 was punishable as contempt of court. *See* Nelles & King, *Contempt by Publication in the United States: Since the Federal Contempt Statute*, 28 Colum.L.Rev. 525, 531 (1928). However, because this early act did not properly define the concept of contempt, abuses arose culminating in the controversy surrounding Judge James H. Peck in 1830.[62] Peck, a district judge in Missouri, was impeached by the United States House of Representatives and tried by the United States Senate for abusing the contempt power. Members of Congress emphasized throughout the Peck trial that the contempt power should be limited to those situations in which it was necessary for the preservation of judicial functions. "Of paramount concern to Congress was the violation of procedural safeguards, including the venue protections, that use of the contempt power entails." Note, *The Obstruction of Justice Puzzle, supra*, 82 Mich.L.Rev. at 99 (footnotes omitted). *See also* A. Stansbury, *supra*, at 87–89, 438–39, 445–46; J. Thomas, *The Law of Constructive Contempt*, 67–72 (1904).

Impelled by the Peck affair, and shortly thereafter, Congress amended the Judiciary Act of 1789 to curtail the contempt authority of the lower federal courts. Act of March 2, 1831, Ch. 99, 4 Stat. 487 ("1831 Act"). Section 1 of that enactment provided the federal courts with summary power to punish contempts occurring "in the presence of said courts or so near thereto as to obstruct the administration of justice." *Id.* at § 1, 4 Stat. at 488. Section 2, however, required that prosecution of all other contempts be conducted according to regular judicial procedures including prosecution by indictment and trial by jury. *Id.* at § 2, 4 Stat. at 488. Section 2 of the 1831 Act was the predecessor of current section 1503. Through the years, this provision has been subject to only minor amendment and retains much of the original language.[63]

The distinctions drawn in sections 1 and 2 of the 1831 Act suggest that Congress had determined that the obstructive conduct prohibited by section 2 did not create an emergency sufficient to justify the use of the summary contempt power. The case for direct contempts is different. In direct contempt situations, the defendant's contumacious acts occur within the presence of the court, and represent a direct challenge to the power and integrity of the judicial process. To preserve the authority of the judiciary and the dignity of the court, Congress has given the courts the summary power to police their proceedings—to ad-

---

**61.** *See id.* at § 17, 1 Stat. 73, 83. Specifically, Congress granted to the inferior federal courts the "power ... to punish by fine or imprisonment, at the direction of said courts all contempts of authority in any case or hearing." It has been argued that such power exists inherently in the courts independent of any statute. *See Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 5 L.Ed. 242 (1821); *United States v. Hudson & Goodwin*, 11 U.S. (7 Chranch) 32, 3 L.Ed. 259 (1812); Note, *An Act Oriented Approach, supra*, 63 B.U.L.Rev. at 932 n. 81; Berger, *Constructive Contempt: A Post Mortem*, 9 U.Chi.L.Rev. 602, 618 (1942); Nells & King, *Contempt By Publication in the United States: To the Federal Contempt Statute ("Contempt By Publication: Part I")*, 28 Colum.L.Rev. 400, 423; Frankfurter & Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers*, 37 Harv.L.Rev. 1010, 1023 (1924).

**62.** For a detailed account of the Peck affair, *see* A. Stansbury, *Report of the Trial of James H. Peck* (1933 & reprint 1972); Nells & King, *Contempt By Publication: Part I, supra*, 28 Colum.L. Rev. at 423–30. *See also*, Note, *An Act-Oriented Approach, supra*, 63 B.U.L.Rev. at 932–33 nn. 82, 83; Note, *The Obstruction of Justice Puzzle, supra*, 82 Mich.L.Rev. at 98–99.

**63.** In 1909, section 2 had become section 135 of the Criminal Code, ch. 321, § 135, 35 Stat. 1088, 1113. It was subsequently codified at 18 U.S.C. § 241 (1940), and in its present form appears as section 1503. For a description of the chronological development of section 1503, *see United States v. Essex*, 407 F.2d 214, 216–17 (6th Cir. 1969).

minister swift justice in order to preserve justice. *See, e.g., Johnson v. Mississippi,* 403 U.S. 212, 214, 91 S.Ct. 1778, 1779, 29 L.Ed.2d 423 (1971); *Illinois v. Allen,* 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970). Cases of constructive contempt, in which the obstructive acts occur outside the presence of the judge, provide a much less immediate and overt threat to the power and integrity of the judiciary and necessitate a much muted response. *See United States v. Lumumba,* 741 F.2d 12, 16 (2d Cir.1984). In fact, whereas the trial judge acts as both prosecutor and jury in direct contempt cases by means of a summary adjudication, a prosecution for constructive contempt under section 1503 is initiated by a member of the executive branch and is tried before a jury. Often the judge presiding over this prosecution is different from the judge before whom the underlying proceeding was brought.[64] It is thus conceivable that the target court remains unaware of the offenses against its administration of justice until the criminal charges against the offender actually are filed. Consistent with the lack of urgency that surrounds constructive contempt situations, Congress has prescribed a much more limited arsenal of weapons to protect the judicial system.[65] Specifically, section 2 of the 1831 Act provided to defendants charged with obstructing justice the procedural safeguards of prosecution by indictment and trial by jury.

In addition, although venue was not expressly addressed by that enactment, the Peck hearings demonstrate specific congressional concern for venue limitations as well as other procedural safeguards. In light of these observations, it is reasonable to believe that in differentiating between direct and constructive contempts, Congress intended that the latter offenses be treated and prosecuted like other breaches of the public order, with all the procedural safeguards, including the venue restrictions, attendant thereto. *See Nye v. United States, supra,* 313 U.S. at 51, 61 S.Ct. at 816.

In reviewing the legislative and historical development of the present obstruction of justice statute, this Court has found no evidence that would lead the Court to suspect that Congress expected prosecutions under section 1503 to be subject to all normal procedural safeguards save the ordinary venue limitations. Rather, this history demonstrates that Congress long-ago perceived a need for different procedural rules for cases of contempt of court than for those involving obstruction of justice. This distinction has survived to the present and requires this Court to hold that defendants prosecuted under section 1503 should be afforded all the procedural safeguards normally extended in criminal prosecutions, including the constitutional guarantees of

**64.** In fact, the Second Circuit has held recently that even in cases of direct contempt, where punishment is not summarily imposed but is rather deferred until another day, the alleged contemnor is entitled to a show cause order or other form of notice and a reasonable opportunity to defend or explain his actions or present arguments in mitigation of the charges brought against him. Moreover, the court admonished that in such circumstances the contempt proceedings be brought before a judge other than the one before whom the target proceeding was brought. *See United States v. Lumumba, supra,* 741 F.2d at 16.

**65.** "Furthermore, even the courts' authority to vindicate *direct* contempts has been curtailed sharply." Note, *An Act-Oriented Approach supra,* 63 B.U.L.Rev. at 951 (citing cases) (emphasis in original). *See also United States v. Lumumba, supra,* 741 F.2d at 15–17. Direct con-

tempts are proscribed by 18 U.S.C. § 401. The summary power to punish such offenses is limited, however, by Rule 42, Fed.R.Crim.Proc., to instances in which the "judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." According to subsection b of that rule, in section 401 contempts occurring outside the courtroom, the defendant is entitled to notice and a hearing. Moreover, as a result of the Supreme Court's decision in *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), a contempt falling within the ambit of Rule 42(b) must be tried before a petit jury unless it can be viewed as a *petty offense.* Consequently, only a limited number of criminal contempts are summarily adjudicated. *See generally* 3 C. Wright, *Federal Practice and Procedure* at § 707 (2d ed. 1982).

trial in the district in which the offending acts were committed.[66]

The distinction between direct and constructive contempts was clarified by the Supreme Court in *Nye v. United States, supra*, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172. *O'Donnell* and its progeny have read *Nye* to imply that venue in a section 1503 prosecution lies in the district in which the potentially affected proceeding is pending.[67] This inference, however, is not supported by either the holding in that case or the rationale upon which that holding rests. In *Nye*, the Supreme Court reviewed the origins and development of the 1831 Act and determined that, in enacting that legislation, Congress had attempted narrowly to confine the federal judiciary's exercise of summary power over contempts of court. This ruling overturned the Supreme Court's earlier decision in *Toledo Newspaper Co. v. United States*, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186 (1918). In that case, the Court had upheld a trial court's power under the 1831 Act to punish summarily a newspaper publisher for the out-of-court publication of certain contemptuous newspaper articles. The *Toledo* court had held that a federal judge is empowered to punish summarily any obstructions, regardless of the locus of their occurrence, as long as there exists a "reasonable tendency" to affect the target court's administration of justice. In *Nye*, the Supreme Court rejected this application of the "reasonable tendency" test and overruled *Toledo*. The Court concluded that the phrase in section 1 of the 1831 Act, "in the presence of said courts, or so near thereto" was a geographic reference restricting the judicial exercise of summary power over contempts. To construe this phrase in the fashion em-ployed in *Toledo*, the Supreme Court explained, would render mere surplusage section 2, providing for the full adjudication of constructive contempts. The Court concluded that the *Toledo* approach was not consistent with Congress' intent as revealed by the legislative history. The Court observed:

> There may, of course, be many types of "misbehavior" which will "obstruct the administration of justice" but which may not be "in" or "near" to the "presence" of the court. Broad categories of such acts, however, were expressly recognized in § 2 of the Act of March 2, 1831 and subsequently in § 135 of the Criminal Code. It has been held that an act of misbehavior though covered by the latter provisions may also be a contempt if committed in the "presence" of the Court. Yet in view of the history of those provisions, meticulous regard for those separate categories of offenses must be had, so that the instances where there is no right to jury trial will be narrowly restricted. If "so near thereto" be given a causal meaning, then § 268 by the process of judicial construction will have regained much of the generality which Congress in 1831 emphatically intended to remove.

*Nye v. United States, supra*, 313 U.S. at 49, 61 S.Ct. at 816 (citations omitted).

Applying this interpretation of the 1831 Act to the facts in *Nye*, the Supreme Court noted that the allegedly obstructive acts occurred more than one hundred miles from the court in which the underlying action was pending, and concluded that such actions were not "so near thereto as to obstruct the administration of justice,"

---

**66.** See *United States v. Kibler, supra*, 667 F.2d at 456 (Winter, C.J., dissenting):

> Thus I cannot read the limitation as having any bearing on venue when Congress has failed to specify venue. It seems to me that the purpose of § 2 of the Act of March 2, 1831 which was the predecessor of 18 U.S.C. § 1503, see *Nye v. United States*, 313 U.S. 33, 45–48, 61 S.Ct. 810, 814–815, 85 L.Ed. 1172 (1941), was to remove the courts' power to punish for constructive contempts and to require that such proceedings be conducted by the normal process of indictment, trial and conviction, including normal rules with respect to venue. Thus I cannot conclude that the offended court should be the preferred forum for prosecution of acts occurring elsewhere.

**67.** See *United States v. O'Donnell, supra*, 510 F.2d at 1195; *United States v. Kibler, supra*, 667 F.2d at 454–55; *United States v. Barham, supra*, 666 F.2d at 524; *United States v. Tedesco, supra*, 635 F.2d at 906.

and therefore could not be punished by the offended court. Nonetheless, the Court acknowledged that such conduct corrupts the judicial process and impedes the administration of justice and could therefore be punished as a constructive contempt. However, the Court explicitly admonished: "If petitioners can be punished for their misconduct, it must be under the Criminal Code where they will be afforded the normal safeguards surrounding criminal prosecutions." *Id.* at 53, 61 S.Ct. at 817. Neither this admonition nor the holding in *Nye* leave room for the expansive interpretation of constructive contempt powers of the federal courts advanced by *O'Donnell* and the courts that follow the Sixth Circuit's lead.

Additionally, this Court finds the *O'Donnell* reliance on *Nye* troubling from another perspective, as well. Stated simply, *Nye* did not involve the question of venue. In that case the Supreme Court did not address the issue of venue, and there is no indication from that decision whether the defendants had even raised this issue before that or any other court. This Court therefore cannot discern the "strong" implication regarding the venue issue under section 1503 that the *O'Donnell* court detected in *Nye.* *See United States v. O'Donnell, supra,* 510 F.2d at 1195. The

Sixth Circuit did not offer any actual reference—either holding or dictum—from *Nye* in support of this inference, and on this Court's reading of that case none exists.[68]

### B. *United States v. Tedesco*

In *United States v. Tedesco, supra,* 635 F.2d 902, the First Circuit reviewed the decisions in *Swann* and *O'Donnell* and accepted as persuasive the *O'Donnell* court's analysis of the legislative history and development of section 1503. Consequently, the *Tedesco* court disagreed with *Swann's* analysis of the text of that statute. In *Tedesco,* the defendant was indicted and convicted under section 1503 in the District of Massachusetts for endeavoring to induce a witness not to testify honestly in a criminal conspiracy and fraud prosecution in the same forum. The defendant had moved to dismiss the indictment on the ground that all of the offending acts occurred in New York, and therefore that venue did not properly lie in the District of Massachusetts for the obstruction prosecution. On appeal, the First Circuit held that "venue under section 1503 is to be determined by focusing on which court is affected by the attempt to influence, obstruct, or impede the due administration of justice. It is the impact of the acts, not their location, that controls." *Id.* at 906. In reaching this

**68.** Moreover, as one commentator has explained:

> Although the *O'Donnell* court did not cite *Nye* as precedent, its use can still be criticized in light of accepted rules for applying legal authority. It is recognized that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedent." *Webster v. Fall,* 266 U.S. 507, 511 [45 S.Ct. 148, 149, 69 L.Ed. 411] (1925); *see United States v. Mitchell,* 271 U.S. 9, 14 [46 S.Ct. 418, 419, 70 L.Ed. 799] (1926) (holding that "[i]t is not to be thought that a question not raised by counsel or discussed in the opinion of the court has been decided merely because it existed in the record and might have been raised and considered"); *see generally* H. Hart & A. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* 386–426, 562–619 (tent. ed. 1958). The Sixth Circuit's conclusion that *Nye* is "clear authority" for the effect-oriented approach to section 1503 is in direct conflict with the principles of stare

> decisis. It is improper for a court to apply an implicit holding of an earlier decision, even if the facts are identical, when the issue was not raised in the earlier case. *See United States v. Moore,* 497 F.2d 976, 980 (5th Cir.1974) (Thornberry, J., dissenting); *see also* R. Cross, *Precedent in English Law* 35–40 (2d ed. 1968) (noting that regardless of the legal propositions stated by the court, "only those which [it] appears to consider necessary for [its] decision are said to form part of the *ratio decidendi* and thus to amount to more than an *obiter dictum*").

Note, *An Act-Oriented Approach, supra,* 63 B.U. L.Rev. 947–48 n. 177. *See also, Gardella v. Chandler,* 172 F.2d 402, 411 (2d Cir.1949) ("it has often been held that a decision is not to be regarded as precedent concerning a question clearly not considered by the Court, because 'to make it so, there must have been an application of the judicial mind to the precise question, ....'") (quoting *St. Louis, Vandalia & T.H.R. Co. v. Terre Haute R. Co.,* 145 U.S. 393, 404, 12 S.Ct. 953, 956, 36 L.Ed. 748 (1892)).

conclusion, the court began by focusing upon the verbs that are used in section 1503 to describe the types of activities that are proscribed by that statute. This approach is premised on the proposition that the verbs of the statute define the activity that constitutes the illegal conduct. The district in which the defendant's acts, as so defined, are said to occur is considered to be the location of the crime and the proper venue for prosecution for such acts.[69]

According to the *Tedesco* court, the words of section 1503 reveal that Congress was concerned not with the locus of the offending acts, but, rather, with the place in which those acts were intended to cause their obstructive effect. Thus, the *Tedesco* court concluded that the important forum under section 1503 is the district of the target proceeding. The court explained:

> The very nature of the crime is affecting, or endeavoring to affect, the due administration of justice; the activities prohibited under the statute are those intended to influence the administration of justice where the affected judicial proceeding is being held or has been held.

*Id.* at 905.

This analysis fails to take account of the decision of the Supreme Court in *Osborn v. United States*, 385 U.S. 323, 332–33, 87 S.Ct. 429, 434–35, 17 L.Ed.2d 394 (1966). The defendant in that case was one of the attorneys defending James R. Hoffa in a criminal prosecution under the Taft-Hartley Act. The defendant was convicted of violating section 1503 by attempting to offer a bribe through a third party to a prospective juror in the pending prosecution. On appeal to the Supreme Court, the

defendant argued that his conviction should be reversed under the doctrine of "impossibility." He claimed that since the third party, who was a government informant, never attempted or even intended to contact the juror, no crime had been committed under section 1503. The Court rejected this argument, concluding that the operative term of the statute was the verb "endeavor." The Court held that the crime prohibited by section 1503 was the endeavor to obstruct justice, irrespective of whether or not this endeavor ultimately proved successful.

The *Osborn* holding indicates that the focus of the statute for purposes of determining whether a crime has been committed is on the obstructive acts themselves, and not on the potential effect of those acts on the target proceeding. In finding a violation of section 1503 even in the absence of any actual interference with the "due administration of justice" in the target proceeding, the Supreme Court held that section 1503 is violated when the defendant acts with the intent to obstruct justice. The location of these acts is, therefore, the locus of the crime and the proper venue for a prosecution under section 1503. Thus, this Court holds, consistent with the *Osborn* court's definition of section 1503, that venue for a prosecution under that statute properly lies only in the district in which the allegedly obstructive acts occurred.

### C. *Public Policy Considerations*

Additionally, the Court is persuaded that the public policy considerations underlying the constitutional venue provisions favor this Court's holding that venue for prosecu-

---

**69.** In the words of one commentator:

> All federal crimes are statutory, and these crimes are often defined, hidden away amid pompous verbosity, in terms of a single verb. That essential verb usually contains the key to the solution of the question: in what district was the crime committed.

Dobie, *Venue in Criminal Cases in the United States District Court* 12 Va.L.Rev. 287, 289 (1926). *See also United States v. Chestnut, supra,* 533 F.2d at 46–47 ("One helpful technique has been to study the key verbs which define the criminal offense in the statute"); *United States*

*v. Walden,* 464 F.2d 1015, 1018–19 (4th Cir. 1972), (citing Dobie); 2 C. Wright, *Federal Practice and Procedure, supra,* § 302 at 196–200; Barber, *Venue in Federal Criminal Cases: A Plea for Return to Principle,* 42 Tex.L.Rev. 39, 40–42 (1963). In applying this methodology, however, the courts must construe the legislation in light of the policies supporting the constitutional venue provisions. *See Travis v. United States, supra,* 364 U.S. at 634, 81 S.Ct. at 360; *United States v. Cores,* 356 U.S. at 407, 78 S.Ct. at 877; *United States v. Johnson, supra,* 323 U.S. at 276, 65 S.Ct. at 250.

tions under section 1503 is proper only in the district in which the allegedly obstructive acts occurred.[70] These provisions were designed to protect criminal defendants from the hardship and unfairness of prosecution in a distant forum. *See United States v. Cores, supra,* 356 U.S. at 407, 78 S.Ct. at 877; *United States v. Johnson, supra,* 323 U.S. at 275, 65 S.Ct. at 250. In general, defendants forced to stand trial in a remote district may suffer from the difficulties occasioned by "unfamiliarity with local counsel, separation from family and friends, and the expense of providing a defense in a foreign place." Note, *An Act-Oriented Approach, supra,* 63 B.U.L.Rev. at 921 (footnote omitted). Placing venue for prosecutions under section 1503 in the district of the offending acts, will, in all likelihood, guarantee that the defendant would be tried in a district in which he has been present and may avoid such hardships.[71]

The Government argues, however, that in those cases, such as the instant one, in which the defendant in the section 1503 prosecution is also the defendant in the target proceeding, this Court's holding would often require the Government to bring separate prosecutions in separate districts. Such situations, the Government argues, waste judicial and prosecutorial resources *without yielding any countervailing benefit to the defendant.* The Court acknowledges that there are cases in which the defendant in the section 1503 prosecution is also the party charged in the target proceeding. *See United States v. Bar-*

ham, supra, 666 F.2d 521; *United States v. O'Donnell, supra,* 510 F.2d 1190; *United States v. Swann,* 441 F.2d 1053. In such cases, the constitutional policy argument in support of this Court's holding appears less persuasive. Because the defendant is already facing prosecution in the target proceeding, the hardships associated with remote prosecutions will exist in only a mitigated form, if at all, if the defendant is tried in that district for the section 1503 violation as well. Moreover, adherence in such situations to this Court's holding would appear to raise two potential problems. First, such a situation may waste valuable societal resources by requiring two separate federal prosecutions, each in a different district. Second, in those cases, the defendant may be hampered by the necessity of standing trial in different districts on related offenses. Upon closer inspection, however, the spectre of these potentialities fails to persuade and does not justify a contrary holding in the instant action.

The purported inefficient allocation of resources from separate prosecutions can be justified in light of the policies behind the constitutional venue provisions. These provisions focus on the defendant's right to be tried in the district in which the crime was committed, regardless of the resulting impact on judicial economy. As one commentator has explained:

> The resulting inefficient allocation of judicial resources can be justified in light of the purposes of venue. In contrast to civil venue [72] which acts to promote con-

---

**70.** The following analysis applies with equal force to this Court's holding with respect to the venue issue under section 1623, *see supra* Part III A, and has been considered by the Court in adjudicating that issue as well.

**71.** This conclusion is especially significant in those situations in which the defendant in the section 1503 prosecution is not also the defendant in the target proceeding. *See, e.g., United States v. Kibler, supra,* 667 F.2d 452; *United States v. Tedesco, supra,* 635 F.2d 902. Forcing the defendant in the section 1503 prosecution to stand trial in the district of the target proceeding frequently may result in his prosecution in a district in which he has not been present and

that is far from the counsel of his trusted attorney and the comfort of his relatives and friends.

**72.** Both the origins and purposes behind criminal and civil venue differ. While the venue rights of a criminal defendant are rooted in constitutional guarantees, venue in civil actions is determined by statute. *See* 28 U.S.C. §§ 1391–1407. Similarly, while the fundamental rationale underlying the criminal venue provisions is to protect the defendant from the hardship of a remote prosecution, the purpose behind the civil venue statutes is to promote convenience and judicial economy in the federal courts. Specifically, the civil venue statutes seek to restrict the civil plaintiff's choice of

venience and efficiency in the administration of the federal courts, the role of criminal venue is to protect the defendant's right to be tried where the crime is committed. Criminal venue is an atomistic concept; it focuses solely on the defendant. It is not a mechanism for easing a crowded federal docket, but rather an important constitutional right. It is therefore improper, when fixing criminal venue, to weigh the additional burden on the federal judiciary.

Note, *An Act-Oriented Approach, supra,* 63 B.U.L.Rev. at 944 n. 162 (citations omitted). The Government's argument that, congressional intent notwithstanding, the Court should hold that venue under Count Four properly lies in the Southern District of New York for reasons of judicial economy undermines the policies and purposes supporting the constitutional venue provisions, and must be rejected.

With respect to the second potential drawback from this Court's holding, the Court acknowledges that charging a criminal defendant in separate districts for separate crimes may force added hardship and expense upon that defendant. However, it is open for such a party to resort to the transfer procedures made available by Rule 21(b), Fed.R.Crim.P. Under this rule, the defendant may move to transfer either or both prosecutions in order to consolidate his defense in one district. While requiring the defendant to invoke such procedures may appear somewhat inefficient, this requirement is consistent with and required by the policies and purposes behind the constitutional venue provisions.

## IV. CONCLUSION

To summarize, the Court is not convinced that under no reasonably possible construction of the allegations in the first two counts of the Indictment, charging defendant with securities fraud under 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, and wire fraud pursuant to 18 U.S.C. § 1343, could a jury find that defendant committed

forum to districts that furnish a mutually convenient place for the proceedings. *See* C. Wright,

legally cognizable offenses. Consequently, the Court is unwilling at this time to dismiss Counts One and Two of the Indictment for failure to allege criminal offenses on the part of defendant. However, with respect to Counts Three and Four of the Indictment, charging defendant with perjury and endeavoring to obstruct justice, under 18 U.S.C. § 1623 and 18 U.S.C. § 1503, respectively, the Court holds that venue for a prosecution under those counts does not lie, on the facts alleged, in the Southern District of New York. Accordingly, defendant's motion to dismiss the Indictment is granted insofar as it seeks dismissal of Counts Three and Four. In all other respects, defendant's motion is denied.

It is so ordered.

*Law of the Federal Courts* §§ 42–43 (4th ed. 1983).